NATIONAL WILDLIFE FEDERATION,
et al., Plaintiffs,

v.

Bruce BABBITT, Secretary of the
Interior, et al., Defendants.

Civ. No. 91–2275 (TAF).

United States District Court,
District of Columbia.

Sept. 21, 1993.

Glenn P. Sugameli, National Wildlife Federation, Washington, DC, for National Wildlife Federation.

L. Thomas Galloway, Galloway & Associates, Howard I. Fox, Sierra Club Legal Defense Fund, Washington, DC, for petitioners.

Thomas J. FitzGerald, Kentucky Resources Council, Frankfort, KY, for Kentucky Resources Council.

David A. Doheny, Elizabeth S. Merritt, Andrea C. Ferster, National Trust for Historic Preservation, Washington, DC, for National Trust for Historic Preservation.

Alfred T. Ghiorzi, U.S. Dept. of Justice, Environment and Natural Resources Div., (Glenda H. Owens, Thomas A. Bovard, Joan R. Goldfarb, Div. of Surface Min., Office of the Solicitor, U.S. Dept. of the Interior, of counsel), Washington, DC, for Federal respondents.

Gregory E. Conrad, Interstate Min. Compact Com'n, Herndon, VA, for Interstate Mining Compact Com'n.

John A. Macleod, Thomas C. Means, J. Michael Klise, Crowell & Moring, (Edward M. Green, Stuart A. Sanderson, American Min. Congress, William E. Hynan, Harold P. Quinn, Jr., National Coal Association, of counsel), Washington, DC, for National Coal Ass'n and American Min. Congress, et al.

## MEMORANDUM OPINION

FLANNERY, District Judge.

In this matter, the Court is once again called upon to decide challenges to regulations implementing the Surface Mining Control and Reclamation Act of 1977 ("SMCRA" or "the Act"), 30 U.S.C. §§ 1201 et seq. The Act seeks to protect society and the environment from the harmful effects of surface coal mining, sometimes known as "strip mining," as well as damage to surface land caused by underground coal mining. The present matter comes before the Court on the parties'[1] cross-motions for summary judgment.

In this case, petitioners, a group of citizen and environmental organizations, challenge the Notice of Inquiry (NOI) published in the July 18, 1991, *Federal Register*, by the Secretary of the Department of Interior. The NOI announced the decision of the Secretary not to pursue rulemaking in regard to the applicability of mining prohibitions to subsidence in certain protected lands. The NOI relied on a July 10, 1991, opinion of the Department's Solicitor which determined that the best interpretation of SMCRA was that subsidence was not subject to the prohibitions found in section 522(e) of the Act.

Petitioners present both substantive and procedural challenges. Petitioners argue that the Secretary's determination is contrary to the plain language of the SMCRA, its legislative history and procedural mandates. Petitioners also challenge the NOI as a violation of the procedural requirements of SMCRA, the Administrative Procedure Act (APA), 5 U.S.C. § 551 et seq., and the National Environmental Policy Act (NEPA), 42 U.S.C. § 4321 et seq. For relief, petitioners request the Court to vacate and set aside the NOI. In the alternative, petitioners request the Court to vacate the NOI as being in violation of the notice and comment requirements of the SMCRA and the APA and in violation of the NEPA for failure to prepare an environmental impact statement (EIS) and to direct that any further rulemaking

1. Petitioners are a group of citizen and environmental organizations. They are collectively referred to as "NWF," after the lead environmentalist plaintiff, the National Wildlife Federation. Defendants are the U.S. Secretary of the Interior and the Director of the Office of Surface Mining Reclamation and Enforcement ("OSMRE"), an agency within the Interior Department charged with implementing the SMCRA (collectively "the Secretary" or "the government"). Intervenor-defendant Interstate Mining Compact Commission ("IMCC") is a multi-governmental organization comprised of 17 states representing the eastern and midwestern regions of the United States. Intervenor-defendants National Coal Association and the American Mining Congress ("Industry") represent the coal mining industry.

comply with those requirements of the SMCRA, the APA, and the NEPA.

In opposition, defendants argue, variously, that NWF lacks standing to pursue its challenge and that the NOI did not represent any action on the part of the Secretary. Defendants request that the Court dismiss the suit or in the alternative, uphold the NOI as a valid interpretation of the SMCRA, not requiring notice and comment.

As stated below, the Court finds that the NOI is a legislative rule. In addition, the Court finds that the NOI was not properly promulgated pursuant to the APA. Therefore, the Court will vacate the NOI as being procedurally invalid and remand to the Secretary for further rulemaking in accordance with the notice and comment requirements of the APA.

## I. History of the Act

### A. Statutory Background

Congress enacted the SMCRA in 1977, establishing "a nationwide program to protect society and the environment from the adverse effects of surface coal mining operations." 30 U.S.C. § 1202(a). One of the goals of the SMCRA is to "assure that the rights of surface. landowners ... are fully protected from such operations," 30 U.S.C. § 1202(b), while another goal is to protect the economic well-being of the coal industry to ensure that it will be able to continue to meet the country's coal needs. *Id.* at § 1202(f).

The SMCRA authorizes the Secretary to set performance standards that provide a baseline of protection for all areas from the harmful impacts of coal mining. SMCRA §§ 515, 516; 30 U.S.C. §§ 1265, 1266. Section 522(e) of the SMCRA prohibits "surface coal mining operations" in certain areas deemed too important or too sensitive to be exposed to damage from coal mining, subject to valid existing rights (VERs) and except for

those operations which existed on August 3, 1977. SMCRA § 522(e); 30 U.S.C. § 1272(e). The term "surface coal mining operations" is defined at SMCRA § 701(28) as

(A) activities conducted on the surface of lands in connection with a surface coal mine or subject to the requirements of section 1266 of this title surface operations and surface impacts incident to an underground coal mine ... and

(B) the areas upon which such activities occur or where such activities disturb the natural land surface.

30 U.S.C. § 1291(28).

At issue here is whether subsidence is included in the definition of "surface coal mining operations" and as such, would be prohibited from areas protected by section 522(e). Subsidence is one of the impacts of underground mining. It has been defined as "the lowering of strata overlying a coal mine, including the land surface, caused by the extraction of underground coal." *Keystone Bituminous Coal Ass'n. v. DeBenedictis,* 480 U.S. 470, 474, 107 S.Ct. 1232, 1236, 94 L.Ed.2d 472 (1987). Surface subsidence is an inevitable result of underground mining, particularly the longwall mining method, which does not leave in place portions of the coal. The surface impacts of subsidence can be devastating, causing damage to "buildings, roads, pipelines, cables, streams, water impoundments, wells, and aquifers." *Id.* at 475 n. 2, 107 S.Ct. at 1237 n. 2, *quoting* Blazey & Strain, *Deep Mine Subsidence—State Law and the Federal Response,* 1 E. Mineral L. Found. § 1.01[2] (1980).

### B. Regulatory Background

The Secretary promulgated permanent program regulations for surface coal mining operations under section 501(b) of SMCRA in 1979, including regulations implementing section 522(e).[2] 44 Fed.Reg. 14,902 (Mar. 13,

---

**2.** During the interim regulatory phase of the SMCRA, surface coal mining operations were subject to concurrent regulation by both the Federal government, acting through OSM, and by the appropriate state authority. According to the IMCC, during this phase, the states issued all permits for new surface coal mining operations

which incorporated the SMCRA standards applicable during the interim program.

Any state wishing to assume permanent regulatory authority over surface coal mining operations on non-Federal lands within its borders must submit a proposed permanent program to the Secretary for approval. If a state can dem-

1979). Regulations at 30 C.F.R. §§ 761.11(d) through (g) implemented the distance prohibitions of section 522(e)(4) and (5)[3], specifying that distances should be "measured horizontally."

The Secretary has given conflicting signals as to whether subsidence is included in the definition of "surface coal mining operations;" specifically, what a "surface impact incident to underground mining" is. During the 1979 rulemaking, OSM rejected a comment concerning the definitions at 30 C.F.R. § 761.5 that "surface operations and impacts incident to an underground mine" should be *limited* to subsidence. 44 Fed.Reg. at 14,-990; Solic.Op. at 11 n. 17. Under certain circumstances, such operations and impacts are permitted under an exception to section 522(e)(2). *See* SMCRA § 522(e)(2)(A). According to the Solicitor's opinion, the "negative implication would appear to be that such operations and impacts (including subsidence) are otherwise prohibited by section 522(e)." Solic.Op. at 11 n. 17.

In the preamble to the final rule prohibiting mining within 100 feet of a public road, the Secretary stated that the distance should be measured horizontally so as not to prohibit underground mining below a public road "where it would be safe to do so." 44 Fed. Reg. at 14,994. The Solicitor also notes that the negative implication from the clause— "where it would be safe to do so"—is that mining "under a public road should be prohibited where it would be unsafe to do so." Solic.Op. at 11 n. 17.

Later, the Secretary stated more clearly that subsidence was a prohibited "surface impact." In 1984, in discussing privately held mining claims within the Otter Creek Wilderness in West Virginia, the Secretary stated that

> although most of the surface operations and impacts incident to such underground mining could be constructed or directed so as not to affect wilderness land, *certain surface impacts to the wilderness could not be avoided, namely subsidence and hydrologic effects.* Thus, even the 22 percent accessible from outside the wilderness could not be recovered without causing *prohibited surface impacts* inside the wilderness area.

onstrate that state laws have been enacted which implement the environmental protection standards of the SMCRA and its accompanying regulations and that the state has the administrative and technical ability to enforce those standards, the state has exclusive jurisdiction to enforce its plan. 30 U.S.C. § 1253(a); *In re Permanent Surface Mining Regulation Litigation*, 653 F.2d 514, 518 (D.C.Cir.1981) (en banc), *cert. denied*, 454 U.S. 822, 102 S.Ct. 106, 70 L.Ed.2d 93 (1981). These states are known as "primacy" states. Of the 17 member states of the IMCC, 14 have received approval of and are administering SMCRA primacy regulatory programs. *See* 30 C.F.R. Part 900. None of these 14 states apparently apply the relevant state counterparts of section 522(e) prohibitions to subsidence effects of underground coal mining operations. Instead, subsidence is regulated under the state counterparts to section 516(b)(1) of the SMCRA, as well as other sections of the state regulatory scheme.

Given this background of the state regulatory programs, IMCC asserts that from the inception of SMCRA, the OSM has never interpreted section 522(e)'s prohibitions to apply to subsidence caused by underground coal mining operations. If the Court were to decide that section 522(e) did apply to subsidence, IMCC argues, substantial disruption of existing state regulatory programs would result with attendant economic consequences. In particular, "takings" claims would be burdensome on the states if the section 522(e) prohibitions applied to subsidence. However, as IMCC recognizes, the issue of whether a compensable taking would occur if section 522(e)'s prohibitions were applied to subsidence is not yet ripe for consideration. Therefore, the Court need not address this issue.

3. Section 522(e)(4) and (5) read:

> After August 3, 1977, and subject to valid existing rights no surface coal mining operations except those which exist on August 3, 1977, shall be permitted—
> (4) within one hundred feet of the outside right-of-way line of any public road, except where mine access roads or haulage roads join such right-of-way line and except that the regulatory authority may permit such roads to be relocated or the area affected to lie within one hundred feet of such road, if after public notice and opportunity for public hearing in the locality a written finding is made that the interests of the public and the landowners affected thereby will be protected; or
> (5) within three hundred feet from any occupied dwelling, unless waived by the owner thereof, nor within three hundred feet of any public building, school, church, community, or institutional building, public park, or within one hundred feet of a cemetery.

49 Fed.Reg. 31,228, 31,233 (Aug. 3, 1984) (emphasis added).

Petitioners challenged the Secretary's interpretation of part 761 of these regulations on the issue of whether section 522(e) prohibitions applied to subsidence in *In re Permanent Surface Mining Regulation Litigation (II)*, 620 F.Supp. 1519, 1553 (D.D.C.1985) (*PSMRL II*), *aff'd in part, rev'd in part on other grounds sub nom., National Wildlife Federation v. Hodel*, 839 F.2d 694 (D.C.Cir. 1988). In that case, the petitioners were concerned that the regulations did not "clearly and explicitly prohibit surface impacts of underground mining within the specified protected areas in §§ 522(e)(4) and (e)(5)." *PSMRL II*, 620 F.Supp. at 1553. Specifically, petitioners were concerned that the regulations did not bar all surface impacts, including all subsidence impacts, within the section 522(e) buffer zones. *Id.* The Secretary responded that the prohibitions of the regulations at 30 C.F.R. §§ 761.11(d)–(g) "extend to surface operations and surface impacts incident to underground coal mining:" the statutory language. Noting that the issue had been raised for the first time in petitioners' reply brief, the Court was reluctant to determine whether an interpretation of a regulation—one not shown to exist anywhere in the record—was arbitrary and capricious. Instead, this Court summarily affirmed the regulations "which track the statutory language" of section 701(28) while noting that the Secretary had committed himself to a new rulemaking with respect to the impact of §§ 522(e)(4) and (5) on underground mining. *Id.*

The Secretary had committed to the new rulemaking in the spring of 1985. The Secretary recognized that the regulations at 30 C.F.R. 761.11(d)–(g) and the definition of "surface coal mining operations" do little more than track the statutory language; therefore, "these regulations do not address the interrelationship between the section 522(e) mining prohibitions and the definition of 'surface coal mining operation' in detail." 50 Fed.Reg. 13,250 (April 3, 1985). In reference to *PSMRL II*, the Secretary noted that it was

> apparently unclear whether OSM's rules have the effect of prohibiting underground mining operations related to the features and facilities within the distance limits enumerated in sections 522(e)(4) and (5) of the Act. The resolution of this issue could have important consequences for the underground mining industry.

*Id.* Accordingly, the Secretary intended to "propose a rule which will address the issue of what is a 'surface impact' incident to underground mining subject to the requirements of Section 516."[4] *Id.* In addition, the rulemaking would "fully explore the attendant legal, policy, environment and potential economic considerations." *Id.*

In 1988, the Secretary undertook rulemaking to clarify existing rules but also to address "the broader issue of whether and to what degree subsidence is covered by the mining prohibitions set forth in section 522(e) of the Act." 53 Fed.Reg. 52,374, 52,379 (Dec. 27, 1988). The Secretary proposed two alternative section 522(e) rule options, noting that the terms "surface impacts incident to an underground coal mine" and "areas upon which such activities disturb the natural land surface," as they appear in section 701(28)(A) and (B), are not defined in SMCRA. *Id.* at 52,380. Invoking his discretion to define these terms, the Secretary outlined two rule options, both of which treated subsidence, in varying degrees, as a surface coal mining operation. The Secretary had also considered an option which would include a complete ban on underground mining beneath protected areas and an option that would not apply section 522(e) prohibitions to subsidence at all, but had apparently rejected these.

In 1989, the Secretary withdrew the proposed rule for further study. 54 Fed.Reg. 30,557 (July 21, 1989). The Secretary had prepared a draft EIS on the 1988 proposed rule, but never finalized it. 54 Fed.Reg. 989 (Jan. 11, 1989). Subsequent to the withdrawal of the proposed rule, the agency issued a

---

**4.** This language mimics the definition in section 701(28)(A): "subject to the requirements of section 1266 of this title surface operations and surface impacts incident to an underground coal mine".

draft EIS which noted that the "agency has continued with the process of establishing rules for determining VER in section 522(e) areas and the extent to which subsidence is subject to the prohibitions of section 522(e) of SMCRA." 1990 Draft EIS, P. I–6, quoted in NWF's brief at 11 n. 2.

In 1991, the agency sought from the Solicitor a legal analysis of the subsidence question. In his opinion, the Solicitor noted that, in the past, OSM had not taken a definitive position on the issue of the applicability of section 522(e) to subsidence. In fact, the Solicitor observed, in some documents, the Secretary had apparently taken the position that section 522(e) does apply to subsidence. On the other hand, the Secretary had also not required states to apply the lands unsuitable prohibitions to subsidence. As a result of these conflicting positions, the Solicitor was attempting to provide clear legal direction as "to whether OSM's preferred position is consistent with the Act." Solic.Op. at 12. The Solicitor rendered a legal opinion stating that "subsidence from underground mining is properly regulated solely under SMCRA section 516[5] and not under 522(e)." Solic.Op. at 2. Relying on the Secretary's discretion under *Chevron, U.S.A., Inc. v. Natural Resources Defense Council*, 467 U.S. 837, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984) to the extent that the language of the SMCRA was unclear, the Solicitor concluded that the key term in § 701(28)(A), which defines "surface coal mining operation," was "activities" not "surface impacts." Solic.Op. at 13–15.

On July 18, 1991, the Secretary published in the *Federal Register* the NOI at issue here stating that subsidence is exempt from section 522(e). 56 Fed.Reg. 33,170 (July 18, 1991). The NOI sought to solicit comments on the "necessity for, and possible scope of, revisions to its current regulations applicable to underground coal mining and control of subsidence affecting lands and structures." *Id.* at 33,171. However, the notice also stated that

Based on its review of the Act and the legislative history, the comments received on the December 27, 1988 proposal, and the Solicitor's opinion, OSM [Office of Surface Mining] has decided that *no further rulemaking action is necessary in regard to the applicability of section 522(e) prohibitions to underground mining.* The current regulations, at 30 C.F.R. 761.11(d), (e), (f) and (g), adequately address underground mining ... [n]o changes to the existing regulations are necessary.

*Id.* (emphasis added). In a subsequent Federal Register notice, the Secretary reaffirmed the finality of the NOI:

Commenters should be aware that since the issuance of the DEIS, the issue of whether and to what degree subsidence is covered by the mining prohibitions set forth in section 522(e) of SMCRA, has been resolved. See the Notice of Inquiry published on July 18, 1991 (56 FR 33170).

56 Fed.Reg. 46,804 (Sept. 16, 1991).

## II. Subject Matter Jurisdiction and Standing

As an initial matter, the Secretary and the intervenor-defendants argue that NWF's petition should be dismissed and their summary judgment motion denied because the Court lacks subject matter jurisdiction[6] and petitioners lack standing.

### A. Subject matter jurisdiction

Industry argues that the Court has no subject matter jurisdiction over NWF's claim because there has been no action on the part of the Secretary. NWF invoked this Court's jurisdiction in part under § 526(a)(1) of SMCRA, which provides:

Any action by the Secretary promulgating national rules or regulations including standards pursuant to sections [501, 515, 516, and 523] of this title shall be subject to judicial review in the United States

---

**5.** Section 516 regulates the surface effects of underground coal mining operations. It includes a number of provisions for controlling subsidence. The Secretary's regulations implementing section 516 are located in large part at 30 C.F.R. Part 817.

**6.** The Secretary does not contest subject matter jurisdiction.

District Court for the District of Columbia Circuit.

30 U.S.C. § 1276(a)(1). Industry contends that a specific jurisdictional provision such as § 526(a)(1) cuts off other bases of general jurisdiction, citing *Save Our Cumberland Mountains, Inc. v. Lujan,* 963 F.2d 1541, 1550 (D.C.Cir.1992) (because § 526(a)(1) is "directive," not permissive, courts have said the provision sets subject matter jurisdiction), *cert. denied,* —— U.S. ——, 113 S.Ct. 1257, 122 L.Ed.2d 655 (1993). *See also Amerikohl Mining, Inc. v. United States,* 899 F.2d 1210, 1215 (Fed.Cir.1990) (§ 526(a)(1) creates the right of judicial review of regulations promulgated under the SMCRA). Neither the NOI nor the Solicitor's Opinion promulgated or amended any rules or regulations, Industry argues; therefore, there has been no "action by the Secretary" sufficient to confer jurisdiction on the Court.

■ The Secretary, however, has conceded that the NOI was a rule, although an interpretative, rather than legislative one. Regardless of whether the rule is interpretative or legislative, then, there has been some action undertaken by the Secretary in the form of rulemaking. Indeed, even without the Secretary's concession, the NOI falls within the APA definition of "rule," which applies because the SMCRA does not contain a separate definition of "rule." *Cf. Center for Auto Safety v. NHTSA,* 710 F.2d 842, 846 (D.C.Cir.1983) (where the Motor Vehicle Information and Cost Savings Act contained no definition of "rule," court applied the definition found in APA § 551(4)).

■ The APA defines a "rule" as the "whole or a part of an agency statement of general or particular applicability and future effect designed to implement, interpret, or prescribe law or policy." 5 U.S.C. § 551(4). This definition, as the D.C. Circuit has held, is "broad enough 'to include nearly every statement an agency may make.'" *Center for Auto Safety,* 710 F.2d at 846. The NOI meets all three criteria of APA § 551(4). First, because it applies to all SMCRA section 522(e) areas, the NOI is of "general or particular applicability." Second, the NOI is of "future effect" because it provides that the prohibitions of section 522(e) do not apply to

subsidence, but instead that section 516 regulates subsidence. Finally, the NOI is "designed to implement, interpret, or prescribe law or policy," because it determines which provision of SMCRA governs subsidence.

■ Both Industry and IMCC argue that the NOI merely maintained the status quo while soliciting public views on the need for possible supplementing of regulations under section 516; therefore, there was no final agency action under the APA. Under the SMCRA, though, "[a]ny action by the Secretary promulgating rules or regulations" is judicially reviewable. 30 U.S.C. § 1276(a)(1). Even under the APA, however, the NOI represents more than mere "potential rulemaking." The core question in determining whether an agency action is final "is whether the agency has completed its decisionmaking process, and whether the result of that process is one that will directly affect the parties." *Franklin v. Massachusetts,* —— U.S. ——, ——, 112 S.Ct. 2767, 2773, 120 L.Ed.2d 636 (1992). Unlike the Secretary of Commerce's action at issue in *Franklin,* the Secretary's issuance of the NOI here is a completion of his decisionmaking process, at least for the issue of whether the prohibitions of SMCRA section 522(e) apply to subsidence. *See* 56 Fed.Reg. 33,170, 33,171 ("OSM has decided that no further rulemaking action is necessary in regard to the applicability of section 522(e) prohibitions to underground mining.").

This Court, therefore, has subject matter jurisdiction over NWF's claim.

**B. Standing**

**1. Background**

■ Standing is limited both by the "case or controversy" requirement of Article III of the Constitution and by "prudential limits on its exercise." *National Wildlife Federation v. Hodel,* 839 F.2d 694, 704 (D.C.Cir.1988) (*NWF*), *quoting Warth v. Seldin,* 422 U.S. 490, 498, 95 S.Ct. 2197, 2205, 45 L.Ed.2d 343 (1974). The constitutional elements of standing embrace three separate, yet "necessarily intertwined components:" (1) actual or threatened injury that (2) "fairly can be traced to the challenged action" and (3) is

"likely to be redressed by a favorable decision." *Id., citing Valley Forge Christian College v. Americans United for Separation of Church and State*, 454 U.S. 464, 472, 102 S.Ct. 752, 758, 70 L.Ed.2d 700 (1982). The party invoking federal jurisdiction "bears the burden of establishing these elements." *Lujan v. Defenders of Wildlife*, — U.S. —, —, 112 S.Ct. 2130, 2136, 119 L.Ed.2d 351 (1992) (citations omitted).

In asserting standing, NWF relies foremost upon the Court of Appeal's affirmance of standing in *NWF*. The Secretary and intervenor-defendants distinguish *NWF*, where the allegations of injury flowed from amendments to earlier regulations and where plaintiffs alleged that the revised regulations improperly implemented SMCRA. In contrast, they contend, the Secretary here has not modified any regulation applicable to controlling subsidence. The NOI merely maintained the status quo, the Secretary asserts. Industry also contends that the Secretary's decision not to engage in further rulemaking would be actionable only if he had a duty to act. NWF is unable to identify such a duty, Industry argues.

In *NWF*, the Court reviewed challenges to NWF's standing to contest 18 surface-mining regulations. The Court outlined "some principles of special relevance" to the case before determining whether NWF had standing. With regards to the prudential component of standing, the *NWF* Court determined that this component was satisfied because Congress had clearly signalled its desire for broad standing under the SMCRA and because NWF's members were clearly among the parties sought to be protected by the SMCRA.[7] *NWF*, 839 F.2d at 704 n. 7, citing H.R.Rep. No. 218, 95th Cong., 1st Sess. 90 (1977), *reprinted in* 1977 U.S.Code Cong. & Admin.News 593, 626 (the phrase " 'any person, having an interest which is or may be adversely affected' shall be construed to be coterminous with the broadest standing re-

quirements enunciated by the U.S. Supreme Court.").

The core of the standing inquiry, the Court stated, was whether the party " 'has been or will in fact be perceptibly harmed by the challenged agency action' ". *Id.* at 704, citing *United States v. SCRAP*, 412 U.S. 669, 688, 93 S.Ct. 2405, 2416, 37 L.Ed.2d 254 (1973). Those who plausibly anticipate future injury can also bring suit, reflecting the "time-honored principle that harm can be actual or threatened." *Id.* at 705 (citation omitted). Injuries to "aesthetic or recreational interests, as well as to more traditional economic interests, will support a claim of standing." *Id.* at 704 (citations omitted).

■■ The Court also noted that, particularly in cases in which the relief requested is the cessation of illegal conduct, the redressability and causation analyses "often replicate one another." *Id.* at 705. Mere indirectness of causation "is no barrier to standing, and thus, an injury worked on one party by another through a third party intermediary may suffice." *Id.* (citations omitted). Moreover, the party seeking judicial relief "need not show to a certainty that a favorable decision will redress his injury;" a "mere likelihood" is sufficient. *Id.*

### 2. Elements of Standing

Initially, the defendants argue that there has been no agency action for NWF to contest. However, by conceding that the NOI is a rule, the Secretary has admitted that he has acted. At the least, the NOI resolved the issue of whether the prohibitions of section 522(e) apply to subsidence. In fact, the Secretary himself concedes that the NOI was necessary for a clarification of his position regarding subsidence and indeed, committed himself to this Court to engage in new rulemaking regarding that issue. The NOI, then, falls within the purview of section 526(a)(1) of SMCRA: "[a]ny action by the

---

7. The Secretary argues that because that he has not modified any regulation applicable to controlling subsidence damage, NWF lacks "broad standing" as defined in *NWF*. *See NWF*, 839 F.2d at 708 (congressional desire for broad standing when a "causal connection exists between deletion of regulatory specifics and ad-

verse environmental effects."). However, Congress did signal its desire for parties such as NWF to be protected under the SMCRA. Thus, NWF falls within the zone of protected interests of the SMCRA. *Id.* at 704 n. 7 ("we readily conclude that the prudential component of the standing requirement is satisfied in this case.").

Secretary promulgating national rules or regulations". The NOI also falls within the definition of final agency action under the APA.

 Under the injury in fact element of standing, a party must show that it "has been or will in fact be perceptibly harmed by the challenged agency action." *United States v. SCRAP*, 412 U.S. 669, 688, 93 S.Ct. 2405, 2416, 37 L.Ed.2d 254 (1973). NWF submits affidavits which allege, variously, damage to property and to recreational and informational interests of the declarants, some of which will occur in the future. Because the Court finds that NWF has alleged sufficient injury in fact to other interests, the Court need not address NWF's claim to information standing.

NWF submits the declarations of seven people, each of whom alleges some type of injury. For example, Jim Winegar, a member of Protect Our Water and Environmental Resources ("POWER") in Pennsylvania, avers that in the next two years, Consolidated Coal plans to conduct longwall mining directly under his property and the road he uses. He avers that the mine threatens to cause adverse surface impacts from subsidence not only to his house but to portions of his land within 300 feet of his house. Mr. Winegar further avers that as a user, resident, and owner of the buildings, facilities and land, he is threatened with physical and economic injury from these impacts. Mr. Winegar states that he will not be able to use roads in the county if they are closed to repair damage from subsidence.

 Neither the Secretary nor the intervenor-defendants has submitted any contrary evidence suggesting that mining will not occur in these areas or that it will not cause subsidence, NWF notes. Furthermore, unlike *Defenders of Wildlife*, Mr. Winegar's presence on the affected areas is not in doubt as he has alleged harm to his residence as well as to roads on which he regularly travels.[8] *See Defenders of Wildlife*, —— U.S. at ——, 112 S.Ct. at 2138 (without a specification of when affiants planned to revisit the areas in question, there could be no finding of actual or imminent injury); *Wilderness Society v. Griles*, 824 F.2d 4, 12 (D.C.Cir. 1987) ("the judgment regarding likelihood of injury turns on whether the plaintiff's future conduct will occur in the same location as the third parties' response to the challenged government action."). Mr. Winegar's allegations of future injury, therefore, are adequate to establish injury-in-fact.[9]

 When the asserted injury arises from the government's allegedly unlawful regulation, or lack of regulation, of someone else, the plaintiff must show that the third parties' "choices have been or will be made in such manner as to produce causation and permit redressability of injury." *Defenders of Wildlife*, —— U.S. at ——, 112 S. at 2137. As noted *supra*, the *NWF* Court determined that the causation and redressability prongs of standing are often replicated. NWF claims that its declarants have established causation by submitting uncontradicted evidence that mining will occur under their homes and under roads they use. In addition, redressability has been established, NWF asserts, because if this case results in a decision by the Secretary applying the prohibitions of section 522(e) to subsidence, coal operators will be required to obey or face enforcement action. *Cf. NWF*, 839 F.2d at 709 n. 11 (a decision eliminating the source of harm to plaintiffs, the "fairly traceable" requirement, will necessarily redress their injuries, the "redressability" requirement).

Defendants argue, though, that even if there have been injuries suffered by the plaintiffs, these injuries were not caused by the NOI, which merely maintained the status quo. Any injuries, defendants argue, were caused by the existing rules as applied by

---

8. *See also* Declaration of Howard Laur, President of POWER, and resident homeowner in Pennsylvania (Consolidated Coal owns the mineral interest in coal seams underneath his property and plans to mine them within the next five years).

9. Mr. Winegar also avers that he has "seen other instances in Greene County in which underground coal mining has caused subsidence impacts on public roads and the surrounding rights-of-way." NWF argues that Mr. Winegar's declaration, as well as similar allegations in other declarations, is sufficient to allege past injury.

Kentucky and Pennsylvania (where declarants reside) in their regulatory programs, as approved in 1982. NWF points out that state programs were approved as no less stringent than the federal program in 1982; therefore, under NWF's interpretation of the regulatory history, these states applied section 522(e) to subsidence. In addition, NWF notes, Kentucky has a requirement that its regulations be no more stringent than the federal program; therefore, any action that the Secretary takes will also be taken in Kentucky.

NWF has identified a declarant, a member of the National Wildlife Federation, Kentuckians for the Commonwealth and Kentucky Resources Council, who lives in Kentucky and who regularly uses and enjoys areas of the Daniel Boone National Forest for "hiking, camping, fishing, and aesthetic enjoyment of the natural beauty of the forest." [10] *See* Declaration of Charles H. Bennett. Two companies are operating underground mining in areas in which Mr. Bennett has hiked and intends to hike in the future.[11] Mr. Bennett alleges that he is personally threatened with physical, recreational, and aesthetic injury from adverse surface impacts of subsidence incident to the underground coal mines. The National Forest would be affected by the Secretary's actions; thus, if the NOI has caused, or will cause, any injuries in Kentucky, they could be redressed through this suit. *See NWF*, 839 F.2d at 708. (federal government enforces surface mining standards on federal lands).

■ Both the Secretary and Industry contend that NWF's declarations merely prove that the NOI did not change the status quo. In reference to Mr. Winegar's affidavit, Industry points out that if the Secretary had

previously interpreted section 522(e)(5), which prohibits surface coal mining operations "within three hundred feet from any occupied dwelling," to apply to subsidence, the permit covering the alleged longwall operation could not have been issued because it would allow mining within 75 feet of Mr. Winegar's house. Moreover, the Secretary contends, many of the declarants' concerns are already addressed in the regulations. For example, regulations dealing with threatened subsidence damage to public roads require that appropriate measures "be used to ensure that the interests of the public and landowners affected are protected." 30 C.F.R. § 784.18. Thus, any road damage would not be attributable to any action of the Federal respondents challenged in this suit, the Secretary argues; any damage would have been caused by a failure on the part of the regulatory authority to impose appropriate restrictions or by an operator's failure to obey those restrictions. A court may only redress injury "that fairly can be traced to the challenged action of the defendant." *Simon v. Eastern Ky. Welfare Rights Org.*, 426 U.S. 26, 41–42, 96 S.Ct. 1917, 1926, 48 L.Ed.2d 450 (1976).

■ The Secretary and the intervenor-defendants' arguments are unavailing, however. In the face of similar arguments, the *NWF* Court rejected Industry's claim that the existence of other regulations imposing "protective conditions" limited possible harm stemming from the new regulations. The Court found this argument went not to standing but to the substantive validity of the new regulations at issue there. *See NWF v. Hodel*, 839 F.2d at 713. Likewise, whether other regulations address NWF's allegations of harm or whether the Secretary's issuance

10. Mr. Raleigh Adams, member of Kentuckians for the Commonwealth and Kentucky Resources Council, also lives in Kentucky. As a homeowner and user of public roads, he declares that he is threatened by likely adverse surface impacts of subsidence incident to underground coal mines. Bituminous Laurel Mining has already mined a portion of one of the three seams running underneath his house. Mr. Adams alleges that the company will likely resume mining under his house and under areas of his property within 300 feet of his house. Furthermore, Mr. Adams alleges that he has seen instances where underground coal mining has caused subsidence

impacts on public roads and surrounding rights-of-way. He alleges that he will not be able to use these roads if they are closed in order to repair damage from subsidence.

11. Unlike the plaintiffs in *Defenders of Wildlife* who could not pinpoint exact times for future visits to countries abroad, Mr. Bennett lives in Kentucky and is thus more *likely* to use *the* Forest than the *Defenders's* plaintiffs would be to travel abroad. In addition, Mr. Bennett regularly uses the Forest for hiking.

of the NOI in fact changed the status quo goes to the merits of the case, not to the standing issue. *Cf. id.* at 714 ("the permissibility of that policy change is an issue we address on the merits, not in the context of standing.").[12]

For the foregoing reasons, the threat to NWF's members are sufficiently real and immediate to show an existing controversy and therefore NWF has standing to challenge the NOI. *See id.* at 709, citing *Blum v. Yaretsky,* 457 U.S. 991, 102 S.Ct. 2777, 73 L.Ed.2d 534 (1982).

## III. Whether the NOI is substantively and procedurally valid

■ In determining questions of statutory interpretation, the Court must address the threshold question of "whether Congress has directly spoken to the precise question at issue." *Chevron v. Natural Resources Defense Council,* 467 U.S. 837, 842, 104 S.Ct. 2778, 2781, 81 L.Ed.2d 694 (1984). If Congress' intent on the precise question is clear, the Court must give effect to that intent. *Id.* at 843 n. 9, 104 S.Ct. at 2781 n. 9. The parties agree that Congress' intent is clear and that the Court need not proceed to the second step of *Chevron. See id.* at 843 n. 9, 104 S.Ct. at 2781 n. 9 ("If a court, employing traditional tools of statutory construction, ascertains that Congress had an intention on the precise question at issue, that intention is law and must be given effect."). What Congress' intent is, though, is the subject of disagreement.

■ However, the Court will not address the merits of whether the Secretary's determination that subsidence is not prohibited by section 522(e) is substantively valid, either under the first or second step of *Chevron.* After reviewing the record and the parties' arguments, the Court finds that the NOI, as a legislative rule, was not properly promulgated pursuant to the notice and comment requirements of the APA. Therefore, the NOI will be vacated and remanded to the Secretary for further rulemaking in accordance with the procedural requirements of the APA.

## A. The NOI is a legislative rule

As the Secretary concedes, the NOI is a rule under the APA definition. *See* discussion *supra.* The APA requires that prior to the promulgation of a rule, general "notice of proposed rulemaking shall be published in the Federal Register" and "the agency shall give interested persons an opportunity to participate in the rule making through submission of written data, views, or arguments." 5 U.S.C. § 553. Notice and comment can be dispensed with if the agency can make the strong showing necessary to establish that its rule fits within one of the section 553(b) exemptions. *Action on Smoking and Health v. CAB,* 713 F.2d 795, 800 (D.C.Cir. 1983). In this case, the Secretary is arguing that the NOI is an "interpretative" rule and thus exempt from the notice and comment requirement.

The Secretary contends that the NOI is an interpretative rule because it created no laws, rights or duties, and did not alter the current regulatory program. For example, the Secretary notes, the NOI is consistent with the regulatory definition of "surface coal mining operations" in 30 C.F.R. § 700.5; with the definition of "surface operations and impacts" in 30 C.F.R. § 761.5; with 30 C.F.R. § 761.11(e)–(g), where the buffer zone is measured horizontally; and with the fact that only surface areas affected by surface activities need to be permitted. *See* 30 C.F.R. § 701.5 (defining "permit area" and "adjacent area"). Because the validity of the Secretary's position as set forth in the NOI depends solely on whether the agency has correctly interpreted congressional intent and specific statutory provisions, the Secretary argues, the NOI is an interpretative rule. The NOI "simply states what the administrative agency thinks the statute means." *General Motors Corp. v. Ruckel-*

---

**12.** Assuming *arguendo* that the NOI did not change the status quo, NWF contends that agency inaction can still be challenged, relying on *Public Citizen v. FTC,* 869 F.2d 1541, 1544 (D.C.Cir.1989). As discussed *supra,* the Court need not reach the issue of whether the NOI changed the status quo to determine standing. Therefore, there is no need to address NWF's contention here.

*shaus,* 742 F.2d 1561, 1565 (D.C.Cir.1984), *cert. denied,* 471 U.S. 1074, 105 S.Ct. 2153, 85 L.Ed.2d 509 (1985).

NWF argues that the precedent established in an earlier case, where this Court held that notice and comment was required under section 553 of the APA for a regulation addressing the term "valid existing rights" found in section 522(e), controls. *See In re Permanent Surface Mining Regulation Litigation,* 22 Env't Rep. (BNA) 1557, 1559–60, 1985 WL 29975 (D.D.C.1985) (the VER definition embodied in § 761.5(a) of the rule as finally promulgated is a legislative rule subject to notice and comment) (*PSMRL*). Given the Secretary's authority to approve or disapprove state programs as set forth in section 503(a) of the SMCRA and his ability to provide for Federal enforcement where a state program is not properly enforcing the program, the Court found that the regulations defining VER were legislative rules, not merely advisory ones. *Id.*

The Secretary and the intervenor-defendants argue that the NOI is not analogous to the rulemaking for VER. In that rulemaking, Congress chose not to define the term VER as used in section 522(e), but left it to the agency to spell out the term either by rulemaking or by adjudication; therefore, the Secretary argues, a regulatory definition of VER would be legislative. By contrast, the issue of whether the prohibitions of section 522(e) apply to subsidence, the Secretary contends, is solely a matter of statutory interpretation or construction, *i.e.,* whether subsidence is included in the definition of "surface coal mining operations," which is defined at section 701(28). Also in the VER rulemaking, the Secretary was attempting to alter a regulatory definition of VER that had been codified. The regulatory definition of "surface coal mining operations" essentially tracks the language of the SMCRA and has

been unchanged since 1979, the Secretary contends.

What the Secretary's argument ignores, however, is that while the term "surface coal mining operations" was defined in the statute, the terms "surface impacts incident to an underground coal mine" and "areas upon which such activities disturb the natural land surface," as they appear in section 701(28)(A) and (B), are *not* defined in the statute. *See* 53 Fed.Reg. at 52,380. In addition, there is no regulatory definition for the term "surface operations and surface impacts incident to an underground coal mine."[13] *Id.* at 52,381. Indeed, during the 1988 proposed rulemaking the Secretary invoked his discretion to define these terms and proposed two rule options, each of which defined subsidence in varying degrees as a surface coal mining operation.[14]

The Secretary's rationale in describing why the VER case required a rulemaking would therefore seem to apply here as well. As the Secretary concedes, Congress apparently left it to the agency to define the terms "surface impacts incident to an underground coal mine" and "areas upon which such activities disturb the natural land surface" just as Congress left it to the agency to define the term VER. The Secretary relied on this delegation in promulgating the proposed rules. Although he withdrew the proposal, the Secretary in essence promulgated a definition of the undefined terms by determining that subsidence was *not* included in those terms, even though there were no changes in the regulations. Given his actions and his rationale for the VER rulemaking, he cannot now argue that there was no delegation of authority to determine that section 522(e) did not apply to subsidence.

NWF also argues that the NOI is a legislative rule because it "binds" the Secretary in any future actions. A recent decision of the Court of Appeals for the D.C. Circuit illumi-

**13.** There is a regulatory definition for a similar term—"surface operations and impacts incident to an underground coal mine"—found at section 522(e)(2)(A). The Secretary argues that the NOI does not change this regulatory definition, found at 30 C.F.R. § 761.5. There are, however, some differences between this regulatory definition and the determination made by the NOI. *See* discussion *infra* at footnote 17.

**14.** "The Secretary has the authority to adopt either interpretation of the undefined terms if his interpretation is consistent with Congressional intent as evinced by the terms of the legislation, the overall statutory scheme, and the legislative history ... great deference should be given the Secretary, in matters which Congress has left to the interpretation of the agency." 53 Fed.Reg. at 52,380.

nates the distinction between legislative and interpretative rules and provides a useful road map for courts in making these types of determinations. *See American Mining Congress and National Industrial Sand Association v. Mine Safety and Health Adm.,* 995 F.2d 1106 (D.C.Cir.1993) (*"AMC"*). In particular, the *AMC* Court notes that in deciding whether a rule is interpretative or legislative, "restricting discretion tells one little about whether a rule is interpretive." *Id.* at 1111 (citations omitted). Instead, the Court formulates a four-factor test for identifying a legislative as opposed to an interpretative rule, the crucial inquiry being whether the rule has "legal effect." *Id.* at 1112. The four factors are whether

> (1) in the absence of the rule there would not be an adequate legislative basis for enforcement action or other agency action to confer benefits or ensure the performance of duties, (2) whether the agency has published the rule in the Code of Federal Regulations, (3) whether the agency has explicitly invoked its general legislative authority, or (4) whether the rule effectively amends a prior legislative rule. If the answer to *any* of these questions is affirmative, we have a legislative, not an interpretive rule.

*Id.* (emphasis added).

NWF argues that the Solicitor invoked the Secretary's general legislative authority.[15] Therefore, NWF argues, the NOI is legislative because the Secretary went beyond the text of the statute in considering factual materials extrinsic to the statute and in exercising his delegated powers without notice and comment.[16] *See Fertilizer Institute v. EPA,* 935 F.2d 1303, 1308 (D.C.Cir.1991). Industry contends, though, that going "beyond the text of the statute" within the meaning of *Fertilizer Institute* does not refer to an agency's reliance on factual materials, but to the agency's exercise of its delegated powers to "implement a general statutory mandate," rather than to merely interpret specific statutory terms.

**15.** NWF claims that Congress made no such delegation, but rather directed that section 522(e) be applied to subsidence.

**16.** The Solicitor's opinion states: "Analysis of this issue requires an understanding of how a prohibition of subsidence under section 522(e)

The distinction drawn in *Fertilizer Institute* between interpretative rules in which an agency merely declares its understanding of what a statute requires and a legislative rule which goes beyond the text of the statute, the *AMC* Court noted, was difficult to find as "almost every rule may seem to do both." *AMC,* 995 F.2d at 1110. The Court provided a different distinction focused on whether the agency *needs* to exercise legislative power to provide a basis for enforcement actions or agency decisions conferring benefits:

> if the dividing line is the necessity for agency legislative action, then a rule supplying that action will be legislative no matter how grounded in the agency's 'understanding of what the statute requires', and an interpretation that spells out the scope of an agency's or regulated entity's pre-existing duty (such as EPA's interpretation of 'release' in *Fertilizer Institute*), will be interpretative, even if, as in that case itself, it widens that duty even beyond the scope allowed to the agency under *Chevron.* (citations omitted)

*Id.*

█ In this case, the term "surface coal mining operations" was defined in the statute and the regulation defining the term reflected the statutory language. While this seems to support the Secretary and intervenor-defendants' argument that the NOI was merely interpreting the statute, it is precisely because the regulation reflected the statutory language that the Secretary committed to rulemaking; rulemaking was necessary to determine how to implement the prohibitions of section 522(e)(4) and (5). *See* 50 Fed.Reg. 13,250 (regulations do little more than repeat the relevant language of the statute, therefore it is apparently unclear whether the rules prohibit underground mining operations in sections 522(e)(4) and (5)). Although the Secretary did not complete that rulemaking, he made a final determination on how to implement the prohibitions of section 522(e)(4) and (5) when he published the NOI.

would affect the underground mining of coal in the United States." Solic.Op. at 9. The Solicitor also noted that "Congress has not made a clear determination" regarding whether section 522(e) applies to subsidence.

The Secretary's error, however, was in not proceeding with notice and comment, as the NOI represented a legislative rule.

In publishing the NOI, the Secretary relied not only upon the Act and its legislative history, but upon the Solicitor's opinion. *See* 56 Fed.Reg. 33,170 ("based upon a recent DOI Solicitor's opinion, the prohibitions of section 522(e) of the Surface Mining Act and 30 CFR 761.11 do not apply to subsidence."). As had the Secretary previously, the Solicitor also cited to *Chevron*, noting that Congress had left it up to the agency to decide whether section 522(e) applied to subsidence: "Since Congress has not made a clear determination, the agency has discretion to adopt a reasonable option for determining the applicability of section 522(e) to subsidence." Solic.Op. at 23. The Secretary was thus invoking his general legislative authority by deciding that section 522(e) did not apply to subsidence and that section 516 did. *See AMC*, 995 F.2d at 1112.

The Secretary has also admitted that he had been inconsistent in defining what was included within "surface coal mining opera-

tions." Therefore, by resolving the inconsistency and by deciding which section of the Act applies to subsidence, the NOI essentially determined "how best to implement a general statutory mandate." *See United Technologies Corp. v. EPA*, 821 F.2d 714, 720 (D.C.Cir.1987) (if the source of the agency's action is based on its power to exercise its judgment as to how best to implement a general statutory mandate, action is likely legislative); *see also Fertilizer Institute*, 935 F.2d at 1308. In addition, even though no regulations were changed, the NOI, by determining whether section 522(e) applied to subsidence, established rights and duties which were previously uncertain. *See AMC*, 995 F.2d at 1110. The NOI, therefore, was a legislative rule.[17] As a legislative rule, the NOI should have been promulgated pursuant to the notice and comment provisions of the APA.[18]

## B. Whether the NOI is a regulation under section 501(b)

NWF also contends that the NOI is a regulation falling within section 501(b) of the

---

17. NWF also argues that the NOI changed a legislative rule. While conceding his inconsistency, the Secretary notes that he has never, either by rulemaking or as a general policy, *taken the position that activities causing subsidence should be prohibited.*

However, there is some regulatory language which supports NWF's argument that the NOI changed a regulation. Under section 522(e)(2)(A), surface coal mining is permitted in protected areas under certain circumstances and "surface operations and impacts are incident to an underground coal mine." In the 1979 program regulations, the Secretary included a provision, still in effect today, which defined "surface operations and impacts incident to an underground coal mine" as stated in section 522(c)(2)(A) as all activities involved in or related to underground coal mining which are *either conducted on the surface of the land, produce changes in the land surface or* disturb the surface, air or water resources of the area, including all activities listed in section 701(28) of the Act *and* the definition of surface coal mining operations appearing in § 700.5 of this chapter. 30 C.F.R. § 761.5 (emphasis added). The preamble to this definition, in response to a commenter's suggestion that the definition should be limited to subsidence, stated that

OSM chose the proposed definition in order to provide comprehensive language that *related to the definition of surface coal mining operations in Section 701(28) of the Act* ... OSM believes

that the final definition should cover all surface disturbances.
44 Fed.Reg. 14,990 (March 13, 1977) (emphasis added); *see also* 53 Fed.Reg. at 52,381 ("OSMRE indicated in its 1978–79 rulemaking, that, at a minimum, subsidence causing material damage was prohibited in section 522(e) areas.").

NWF's argument suggests that the term "surface operations and impacts incident to an underground coal mine" found in section 522(e)(2)(A) and the similar term "surface operations and *surface* impacts incident to an underground coal mine" found in section 701(28) (emphasis added) are *interchangeable. In fact, the* Secretary has conceded this to some extent in his papers. In pointing out that the NOI has not changed any regulations, the Secretary cited to 30 C.F.R. § 761.5, among others, arguing that the NOI is consistent with this regulatory definition. Yet even a cursory comparison of the definition at 30 C.F.R. § 761.5 and the approach as espoused in the NOI shows that the two are different. The NOI definition of "surface coal mining operations" simply reaches activities conducted on the surface of the land. The NOI, therefore, would change the regulatory definition found at 30 C.F.R. § 761.5.

18. Because the Secretary withdrew the proposed rule, any comments received on that proposal would not satisfy the notice and comment requirements for the NOI. The NOI represented a new rulemaking.

SMCRA. Section 501(b) provides for promulgation by the Secretary of "regulations" covering a

> permanent regulatory procedure for surface coal mining and reclamation operations performance standards based on and conforming to the provisions of this subchapter and establishing procedures and requirements for preparation, submission, and approval of State programs; and development and implementation of Federal programs under the subchapter.

30 U.S.C. § 1251(b). These regulations "shall" be promulgated in accordance with subsection (a), which provides that prior to promulgation of any regulation, the Secretary must first publish the proposed regulations, allow for a period of public comment and hold at least one public hearing. 30 U.S.C. § 1251(a)(A), (C).

■ NWF relies on this Court's previous alternative holding that notice and comment was required under section 501(b) as well as under the APA for regulations addressing the grandfathering term "valid existing rights" found in section 522(e). *See PSMRL,* 22 Env't Rep. at 1560 n. 2 (respondents did not oppose the plaintiff's contention that the procedural requirements of section 501(b) were also necessary). The Court need not reach the issue of whether the NOI is a regulation under the SMCRA, however. Because the NOI is a legislative rule under the APA, it should have been promulgated pursuant to the procedural requirements of the APA.

## IV. Whether the Secretary violated the NEPA by failing to prepare an environmental impact statement

NWF alleges that the Secretary also violated NEPA by failing to prepare an environ-

mental impact statement (EIS) on the Notice of Inquiry. Two draft EIS's were prepared in connection with previous rulemakings, but no final EIS was ever issued.

NEPA requires agencies to prepare EIS's for "every recommendation or report on proposals for legislation and other major Federal actions significantly affecting the quality of the human environment." NEPA § 102(2)(C), 42 U.S.C. § 4332(2)(C). Under NEPA and the Council of Environmental Quality (CEQ) regulations implementing the act, the term "Federal actions" is defined:

> Federal actions tend to fall within one of the following categories: (1) Adoption of official policy, such as rules, regulations, and interpretations adopted pursuant to the Administrative Procedure Act ...; formal documents establishing an agency's policies which will result in or substantially alter agency programs.

40 C.F.R. § 1508.18(b). "Actions" is defined to include "new or revised agency rules, regulations, plans, policies, or procedures." *Id.* at § 1508.18(a).

Because the Court has determined that the NOI is a legislative rule, the Court need not address the Secretary's contentions that interpretative rules do not fall within the definition of federal action because they are not "adopted pursuant to the Administrative Procedure Act." However, the Secretary also contends that because the NOI represented a decision not to promulgate a rule, no EIS was required because there was no specific proposal for a particular action to be taken.[19] *See Defenders of Wildlife v. Andrus,* 627 F.2d 1238, 1243–44 (D.C.Cir.1980) (if an agency decides not to act, and thus not to present a proposal to act, "the agency never reaches a point at which it need prepare an impact statement."). Instead, the Secretary

---

19. Industry adds that the Secretary's alleged rulemaking is inchoate in that he has merely solicited comments on a "potential" rulemaking. Because there are no assurances that the potential rulemaking will ever occur, Industry argues that the law leaves this Court in "no position to speculate" that one or another version will ever become final, citing *Public Citizen v. OTR,* 970 F.2d 916, 920 (D.C.Cir.1992) (NEPA claims are routinely dismissed in cases where agencies are merely contemplating a particular course of action but have not taken any final action at the time of the suit). What the intervenor-defendant's argument ignores, however, is that the Secretary stated in the NOI that no further rulemaking was necessary on the issue of section 522(e) and subsidence. It is the rulemaking regarding section 516 that is inchoate.

asserts, the NOI merely maintains the status quo and as such, does not trigger the requirements of NEPA. *See Committee for Auto Responsibility v. Solomon,* 603 F.2d 992, 1002–03 (D.C.Cir.1979) ("duty to prepare an EIS normally is triggered when there is a proposal to change the status quo.") (footnote omitted), *cert. denied,* 445 U.S. 915, 100 S.Ct. 1274, 63 L.Ed.2d 599 (1980); *Upper Snake River Chapter of Trout Unlimited v. Hodel,* 921 F.2d 232, 235 (9th Cir.1990).

Many of the arguments put forth by the parties are similar to the arguments made concerning whether the NOI is a rule. For example, the Secretary and the intervenor-defendants point out that the NOI did not necessitate any change in the regulations. They argue that those who operate under the current regulations will not change their conduct as a result of the NOI or the Solicitor's Opinion.[20] Therefore, the respondents argue, the NOI did not represent a "major Federal action" falling within the requirements of NEPA.[21]

As a legislative rule, the NOI is a Federal action within the definition codified at 40 C.F.R. section 1508.18(b) ("rules, regulations, and interpretations adopted pursuant" to the APA). The question, however, is whether the NOI is a "major Federal action."

Although the Secretary now argues that NEPA has not been triggered by the NOI, he did prepare draft EIS's during the proposed rulemakings. *See* 53 Fed.Reg. at 52,-382 ("OSMRE has determined that the proposed rules require the preparation of an environmental impact statement"). NWF also cites to language in the draft EIS's in which the agency states, for example, "[a]ll impacts which have the potential to become major, or are major are considered significant impacts under NEPA." 1990 Draft EIS at IV–14. Based on these statements and the very fact that the Secretary prepared EIS's for the proposed rulemaking, NWF argues that the Secretary should have also prepared one for the NOI.

The Secretary contends that he should not be bound by "draft" statements or by "draft" documents in reaching a decision not to prepare an EIS for the NOI. Of course, if there has been no "major Federal action," there is no requirement for an EIS. The Court finds it curious, though, that during the proposed rulemaking the Secretary prepared two draft EIS's, demonstrating that he thought he was engaging in "major Federal action," yet did not prepare an EIS for the NOI, which in the Secretary's own words, "resolved" the issue of whether section 522(e) applied to subsidence: the same subject of the proposed rulemaking. *See* 50 Fed.Reg. 13,250 (notice of intent to conduct rulemaking stating that "[o]f particular importance in the rulemaking will be the relationship of section 522(e) and mining-related subsidence.").

Regardless, in light of the Court's order vacating the NOI and remanding to the Secretary for further rulemaking, it is not necessary for the Court to determine whether the NOI constitutes a "major Federal action" requiring an EIS. Without a NOI, there has been no resolution of the issue of whether section 522(e) applies to subsidence. Therefore, it would be premature for the Court to order that the Secretary prepare an EIS. *Cf. Public Citizen v. NRC,* 940 F.2d 679, 684 (D.C.Cir.1991) ("Because the Commission has not yet made the key decisions that will result in a particular 'course of action' ... we decline to order it to prepare an environmental impact statement now."). However, the Court notes for the record that once the rulemaking has been completed, the Secretary must either prepare an EIS or state on

---

20. The Secretary notes that even if some states were applying section 522(e) to subsidence, they would be free to continue to do so because the SMCRA expressly provides that state programs that are more stringent than the Federal program are not inconsistent with the Act. *See* 30 U.S.C. § 1255(b).

21. If the Court finds that the NOI was a "major Federal action," Industry argues that the Secretary has complied with NEPA by making an informed decision. Before he issued the NOI, the Secretary prepared draft EIS's assessing environmental consequences of promulgating regulations regarding section 522(e) and subsidence. As NWF points out, however, CEQ regulations provide that EIS's "shall be prepared in two stages:" draft and final. 40 C.F.R. § 1502.9. The final EIS should "assess and consider comments." The Secretary did not do this in promulgating the NOI.

the record the reasons why an EIS has not been prepared. *See* 40 C.F.R. §§ 1501.4(a) (agency shall determine whether the proposal is one which normally requires an EIS or is one which falls within a categorical exclusion) *and* (b) (if action does not fall within section 1501.4(a), agency shall prepare an environmental assessment). This is necessary in the event this case comes back before this Court; there will be a "basis for the judicial review of the agency's decision." *Defenders of Wildlife*, 627 F.2d at 1246.

## V. Conclusions

Upon reviewing the parties' briefs and the record, the Court denies the Secretary's and the intervenor-defendants' motions for summary judgment, and grants in part and denies in part NWF's motion for summary judgment. This case is remanded back to the Secretary for rulemaking in accordance with the notice and comment procedures of the APA. An appropriate order is filed herewith.