MILK INDUSTRY FOUNDATION,
Plaintiff,

v.

Daniel R. GLICKMAN, Secretary,
United States Department of
Agriculture, Defendant,

Northeast Dairy Compact Commission,
Defendant–Intervenor.

Civil Action No. 96–2027 (PLF).

United States District Court,
District of Columbia.

Dec. 11, 1996.

Steven J. Rosenbaum, Covington & Burling, Washington, DC, for Plaintiff.

Marcia Sowles, U.S. Dept. of Justice, Civil Division, Federal Programs Branch, Washington, DC, for Defendant.

Clifford M. Sloan, Wiley Rein & Fielding, Washington, DC, for Defendant–Intervenor.

## OPINION

PAUL L. FRIEDMAN, District Judge.

■ In creating the Union, the Framers acknowledged the inherent right of the states to make compacts and agreements with each other subject only to the limitation that Congress must consent to such compacts: "No State shall, without the Consent of Congress ... enter into any Agreement or Compact with another State...." U.S. Const., Art. I, sec. 10, cl. 3. A compact accorded congressional consent "is more than a supple device for dealing with interests confined within a region.... [I]t ... also [can be] a means of safeguarding the national interest...." *West Virginia ex rel. Dyer v. Sims,* 341 U.S. 22, 27, 71 S.Ct. 557, 560, 95 L.Ed. 713 (1951). "Once given, 'congressional consent transforms an interstate compact ... into a law of the United States.'" *Texas v. New Mexico,* 462 U.S. 554, 564, 103 S.Ct. 2558, 2565, 77 L.Ed.2d 1 (1983) (quoting *Cuyler v. Adams,* 449 U.S. 433, 438, 101 S.Ct. 703, 707, 66 L.Ed.2d 641 (1981)).

■ In 1993, the six New England states—Connecticut, Maine, Massachusetts, New Hampshire, Rhode Island and Vermont—agreed to form the Northeast Interstate Dairy Compact, a compact enabling them to raise the minimum milk prices that dairy processors must pay to dairy farmers in their region for milk processed and consumed in fluid form.[1] Congress consented to

---

1. The Court has been advised that the Northeast
Interstate Dairy Compact Commission, the de-

the Compact through a bill signed into law on April 4, 1996. Plaintiff, the Milk Industry Foundation, a trade association whose members process, market and distribute fluid milk and fluid milk products nationwide, maintains that Congress did not "consent" to the Northeast Dairy Compact but instead impermissibly delegated this constitutional responsibility to the Secretary of Agriculture. It challenges this act of Congress as an unconstitutional delegation of legislative power and also maintains that, even if Congress had the authority to make such a delegation, the Secretary of Agriculture exercised his delegated authority arbitrarily and capriciously in violation of the Administrative Procedure Act. Plaintiff filed this action for declaratory and injunctive relief against the Secretary of Agriculture and seeks a preliminary injunction.[2]

## I. BACKGROUND

■ In a response to the disruption of agriculture product pricing during the Great Depression that had an injurious effect on farmers, including a severe drop in milk prices, Congress passed the Agricultural Marketing Agreement Act ("AMAA") in 1937. 7 U.S.C. § 601 *et seq. See Cumberland Farms, Inc. v. Lyng,* Civ. No. 88–2406 (CSF), 1989 WL 52697 (D.N.J. May 15, 1989). By this Act, Congress, *inter alia,* initiated the federal program for the regulation of minimum milk prices that milk processors must pay to dairy farmers, and it delegated to the Secretary of Agriculture the authority to set minimum milk prices nationwide. These national prices are to reflect

the available supplies of feeds, and other economic conditions which affect market supply and demand for milk and its products in the marketing area ...; [the need to] insure a sufficient quantity of pure and wholesome milk to meet current needs; [the need to] assure a level of farm income adequate to maintain productive capacities sufficient to meet anticipated future needs, and be in the public interest.

7 U.S.C. § 608c(18). The proceeds of milk sales by all processors subject to the Secretary's regulations are pooled and later distributed in accordance with a weighted average to all dairy farmers who have provided milk at the federally set price. 7 U.S.C. § 608c(5)(B)(ii). Under the AMAA, the states retain the authority to establish milk prices *above* the federally established floor set by the Secretary. *See United Dairy Farmers Cooperative Ass'n v. Milk Control Comm'n,* 335 F.Supp. 1008, 1013–15 (M.D.Pa.) (three-judge court), *aff'd without opinion,* 404 U.S. 930, 92 S.Ct. 280, 30 L.Ed.2d 244 (1971).

In 1988, Vermont began considering the possibility of regulating milk prices beyond its own state borders by forming an interstate compact to be comprised of the states of Connecticut, Maine, Massachusetts, New Hampshire, Rhode Island and Vermont. By 1993, all six of the New England state legislatures had approved the formation of the Northeast Interstate Dairy Compact, and all six of the states' governors had signed resolutions supporting it. The Compact states agreed to establish a Commission to administer the Compact. The Commission was to consist of three to five persons from each state, with at least one person from each state being a dairy producer and another a consumer representative. Compact Art. III,

fendant-intervenor, recently changed its name to the Northeast Dairy Compact Commission.

**2.** The Court need not pause over the challenge to plaintiff's standing. Plaintiff is an association with approximately 200 member companies that are milk producers throughout the United States, including the Northeast Compact Region. The Milk Industry Foundation's members collectively process approximately 80 percent of the fluid milk and fluid milk products consumed in the United States. Pl.'s Supplemental Br., Affidavit of Charles N. Shaw at 1–2 (October 16,

1996). At the very least, plaintiff's members buying milk in the Compact Region could face significant injury if the Compact were to carry out its goal of raising fluid milk prices over the federally-ordered price. The Milk Industry Foundation, representing the interests of its members, undoubtedly has standing to seek a preliminary injunction that some, if not all, of its members could seek in their own right. *See United Food and Commercial Workers Union Local 751 v. Brown Group, Inc.,* — U.S. —, —, 116 S.Ct. 1529, 1534, 134 L.Ed.2d 758 (1996).

§ 4.[3]

Under the Compact, the Commission would have the authority to (1) review and propose changes in state laws and regulations pertaining to milk and dairy products, (2) review and recommend changes in the existing structure of milk assembly and distribution, (3) investigate costs and charges for milk hauling, processing and other services, (4) examine the economic forces affecting milk production, consumption and prices, and (5) establish an "over-order" price to producers, a price up to $1.50 over the federal order minimum price for milk used in fluid products, including the authority to require that all handlers, except producer-handlers, pay producers the over-order price for milk used in fluid products. Compact Art. IV, §§ 8, 9(a), 9(b). The Commission's price setting powers purport to extend to processing plants located both within and without the New England Compact region with respect to milk the processors sell in New England. Compact Art. II, § 2(7), Art. IV, § 9(d).

The Compact states first sought congressional approval of the Compact with a bill introduced in both houses of the 103d Congress, S. 2069 in the Senate and H.R. 4560 in the House. Neither bill was enacted. An effort to include congressional approval of the Compact in the Balanced Budget Reconciliation Act of 1995, H.R. 2491, in the 104th Congress also failed, as did the attempt to pass a Senate Resolution, providing for Compact approval. S.J.Res. 28, 104th Cong. § 1(b) (1995).

Compact proponents then turned to the Federal Agricultural Improvement and Reform Act of 1996 (the "Farm Bill" or "FAIRA"), which touched a variety of critical agricultural issues. When first introduced, FAIRA contained no provision relating to the Northeast Dairy Compact in either the House or the Senate. The House bill, H.R. 2854, was passed on February 29, 1996, still without any provision relating to the Compact. On the Senate side, Compact proponents introduced proposed Amendment 3184 to S. 1541 which added a provision to the Farm Bill consenting to the Compact. 142

CONG.REC. S999 (1996); Pl.'s Mot. for Prelim. Injunction, Ex. 16. A vote on the Senate floor resulted in the defeat of the amendment, and the Senate passed the Farm Bill without a provision consenting to the Compact. 142 CONG.REC. S1001–36, S1191–1262 (1996); Pl.'s Mot. for Prelim. Injunction, Exs. 17, 18.

The House and Senate Farm Bills then went to a House–Senate Conference Committee. The Committee voted to include a provision in the bill, Section 147, that would constitute Congress' consent to the Compact. No written record of the Conference Committee deliberations was made, and the Conference Report merely recites the language of Section 147 without any explanation for its inclusion. H.R. Conf. Rep. No. 104–494, 104th Cong. at 339 (1996); Pl.'s Mot. for Prelim. Injunction, Ex. 19. There therefore is no legislative history that explains the reasoning behind the decision of Congress to add Section 147 to the Farm Bill. The Conference Report on the Farm Bill, including Section 147, was passed by both the House and the Senate on March 28, 1996. It was signed by the President and became law on April 14, 1996, as the Federal Agricultural Improvement and Reform Act of 1996, Pub.L. No. 104–127, § 147, 110 Stat. 888, 919–20 (1996). See Pl.'s Mot. for Prelim. Injunction, Ex. 22.

Section 147 of FAIRA provides:

Congress hereby consents to the Northeast Interstate Dairy Compact entered into among the States of Connecticut, Maine, Massachusetts, New Hampshire, Rhode Island and Vermont as specified in section 1(b) Senate Joint Resolution 28 of the 104th Congress, as placed on the calendar of the Senate, subject to the following conditions:

(1) FINDING OF COMPELLING PUBLIC INTEREST.—Based upon a finding by the Secretary [of Agriculture] of a compelling interest in the Compact region, the Secretary may grant the States that have ratified the Northeast Interstate Dairy Compact, as of the date

---

**3.** The Northeast Interstate Dairy Compact is contained within S.J.Res. 28, 104th Cong. § 1(b) (1995). See Pl.'s Mot. for Prelim.Injunction, Ex. 9.

of enactment of this title, the authority to implement the Northeast Interstate Dairy Compact.

FAIRA, Pub.L. No. 104–127, § 147, 110 Stat. 888, 919 (1996). *See* Pl.'s Mot. for Prelim. Injunction, Ex. 22.[4]

On May 3, 1996, the Secretary of Agriculture began the process of making the required compelling public interest finding through a *Federal Register* Notice soliciting public comments on whether there exists a "compelling public interest in the Compact region." 61 FED.REG. 19,904 (1996); Pl.'s Mot. for Prelim. Injunction, Ex. 23. As a result, over 1,600 comments were filed with the Secretary, both for and against Compact approval. Def.'s Mem. in Opp'n at 8; Intervenor's Mem. in Opp'n at 39. Those groups opposing approval included several Midwestern states, consumer groups and dairy farmer organizations in the Midwest and Northeast. Those groups supporting approval of the Compact included New England dairy farmers, the six Compact State governors, and various state legislatures.

On August 28, 1996, the Secretary of Agriculture published his finding of compelling public interest in the *Federal Register,* which read in its entirety:

> Whereas the State legislatures in Connecticut, Maine, Massachusetts, New Hampshire, Rhode Island, and Vermont have approved the Northeast Interstate

Dairy Compact, the governor of each Compact State has signed a resolution supporting the Compact, the Congress has consented to the Compact in the Federal Agriculture Improvement and Reform (FAIR) Act of 1996, and approximately ninety-five percent of the comments the Department of Agriculture received regarding the Compact supported its implementation, I hereby find that a compelling public interest in the Compact region exists and authorize the Compact States to implement the Northeast Interstate Dairy Compact. This finding and authorization shall be effective immediately and shall be published in the *Federal Register.*

61 FED.REG. 44,290 (1996); Pl.'s Mot. for Prelim. Injunction, Ex. 24.

At the same time, the Secretary of Agriculture issued a press statement, also published in the *Federal Register,* which included the following:

> While it is unclear what specific actions the Compact Commission will take to implement the Compact, I am concerned about the potential effects of the Compact in several respects. I intend therefore, to monitor closely its implementation. I also encourage Congress to exercise its oversight function and monitor the implementation of the Compact. If my expectations are not met, or if conditions otherwise

---

4. Section 147 also provided:

(2) LIMITATION ON MANUFACTURING PRICE.—The Northeast Interstate Dairy Compact Commission shall not regulate [milk prices] other than [for] Class I (fluid milk). . . .

(3) DURATION.—Consent for the Northeast Interstate Dairy Compact shall terminate concurrent with the Secretary's implementation of the dairy pricing and Federal milk marketing order consolidation and reforms. . . .

(4) ADDITIONAL STATES.—Delaware, New Jersey, New York, Pennsylvania, Maryland, and Virginia are the only additional States that may join the Northeast Interstate Dairy Compact. . . .

(5) COMPENSATION OF COMMODITY CREDIT CORPORATION.— . . . The Northeast Dairy Compact Commission shall compensate the Commodity Credit Corporation for the cost of any purchases of milk and milk products by the Corporation that result from the projected rate of increase in milk production for the fiscal year within the Compact region

in excess of the national average rate of the increase in milk production. . . .

(6) MILK MARKETING ORDER ADMINISTRATOR.—At the request of the . . . Compact Commission, the Administrator of the applicable Federal milk marketing order issued under [the AMAA] shall provide technical assistance to the Compact Commission. . . .

(7) FURTHER CONDITIONS.—The . . . Compact Commission shall not prohibit or in any way limit the marketing in the Compact region of any milk or milk product produced in any other production area in the United States. The Compact Commission shall respect and abide by the ongoing procedures between Federal milk marketing orders. . . . The Compact Commission shall not use compensatory payments . . . as a barrier to the entry of milk into the Compact region or for any other purpose. FAIRA, Pub.L. No. 104–127, § 147, 110 Stat. 888, 919–20 (1996): Pl.'s Mot. for Prelim.Injunction, Ex. 22.

warrant, I will revoke this authorization to implement the Compact.

I expect that the Compact Commission will implement the Compact in a way that does not burden other regions of the country, consistent with the provisions of the FAIR Act and the Compact. I would be greatly concerned if the Commission restricts in any way the ability of producers to ship milk into the Compact region. I will monitor whether the Compact has any adverse effects on the income of dairy producers outside the Compact region as well as the extent to which the Commission utilizes its authority to impose production controls to minimize the effect of the Compact on other dairy producing regions. I also expect the Commission to ensure that its actions are flexible and responsive to changing supply, demand and price conditions in milk markets.

Perhaps most significantly, I am deeply concerned about and will closely monitor the effect of the Compact on consumers, especially low-income families, within the Compact region. I expect that the Commission will pay close attention to and monitor the effects of its decisions on consumers before and after it takes any action. I also expect the Commission and Compact States to provide assistance to offset any increased burden on low-income families in the Compact region. I am also concerned about the effect of the Compact on the Department of Agriculture's nutrition programs, and I expect the Commission to exercise its authority to reimburse participants in the Special Supplemental Nutrition Program for Women, Infants, and Children (WIC)....

The Compact is a transitional milk marketing system for the region and will expire when a new nationwide Federal milk marketing order structure is implemented. I believe the approach outlined in this statement offers the best opportunity to strengthen the dairy industry in the Compact region during the transition to the reformed milk marketing order structure required by the FAIR Act.

61 FED.REG. 44,291 (1996); Pl.'s Mot. for Prelim. Injunction, Ex. 30.

## II. DISCUSSION

### A. Standards For Granting Emergency Injunctive Relief

In deciding whether to grant emergency injunctive relief, the Court must consider (1) whether there is a substantial likelihood that plaintiff will succeed on the merits of the case, (2) whether plaintiff will suffer irreparable injury absent an injunction, (3) the harm to defendants or other interested parties, and (4) whether an injunction would be in the public interest or at least not be adverse to the public interest. *Sea Containers Ltd. v. Stena AB,* 890 F.2d 1205, 1208 (D.C.Cir.1989); *Washington Metro. Area Transit Comm'n v. Holiday Tours, Inc.,* 559 F.2d 841, 843 (D.C.Cir.1977).

■ Plaintiff is not required to prevail on each of these factors. Rather, under *Holiday Tours,* the factors must be viewed as a continuum, with more of one factor compensating for less of another. "If the arguments for one factor are particularly strong, an injunction may issue even if the arguments in other areas are rather weak." *CityFed Fin. Corp. v. Office of Thrift Supervision,* 58 F.3d 738, 747 (D.C.Cir.1995). An injunction may be justified "where there is a particularly strong likelihood of success on the merits even if there is a relatively slight showing of irreparable injury." *Id.* Conversely, when the other three factors strongly favor interim relief, a court may grant injunctive relief when the moving party has merely made out a "substantial" case on the merits. The necessary level or degree of likelihood of success that must be shown will vary according to the Court's assessment of the other factors. *Washington Metro. Area Transit Comm'n v. Holiday Tours, Inc.,* 559 F.2d at 843–45. In sum, an injunction may be issued "with either a high probability of success and some injury, or *vice versa.*" *Cuomo v. United States Nuclear Regulatory Comm'n,* 772 F.2d 972, 974 (D.C.Cir.1985).

In this case, the Court finds that plaintiff has a substantial likelihood of success on the merits with respect to its Administrative Procedure Act claim, although not with respect to its constitutional claim. The most

relevant inquiry therefore is whether plaintiff will suffer irreparable injury.

### B. Substantial Likelihood of Success on the Merits

#### 1. Unconstitutional Delegation of Congressional Authority

Plaintiff argues that the Constitution provides that only Congress can consent to an interstate compact, that the consent of Congress is a specific action, effective by its own force, and that the first condition of Section 147 of the 1996 Farm Bill—giving the Secretary of Agriculture authority to implement the compact only upon a finding of a compelling public interest in the Compact region— constitutes an unconstitutional delegation of legislative authority to the Executive Branch of government. It relies on the first articulation of the nondelegation doctrine by the Supreme Court in *Field v. Clark*, 143 U.S. 649, 692, 12 S.Ct. 495, 504, 36 L.Ed. 294 (1892) ("That Congress cannot delegate legislative power to the President is a principle universally recognized as vital to the integrity and maintenance of the system of government ordained by the Constitution"), and the most recent one by a court of appeals in *South Dakota v. U.S. Dep't of Interior*, 69 F.3d 878 (8th Cir.1995), *vacated and remanded*, —— U.S. ——, 117 S.Ct. 286, 136 L.Ed.2d 205 (1996).[5]

The Supreme Court has in fact held delegations of legislative power to Executive Branch departments or agencies unconstitutional on only two occasions, both in the same year and both involving delegations under the same statute, the National Industrial Recovery Act. *Panama Refining Co. v. Ryan*, 293 U.S. 388, 55 S.Ct. 241, 79 L.Ed. 446 (1935); *A.L.A. Schechter Poultry Corp. v. United States*, 295 U.S. 495, 55 S.Ct. 837,

79 L.Ed. 1570 (1935). As Professor Davis has pointed out, these decisions "are best understood in their unique historical context," which included deep skepticism about President Roosevelt's revolutionary economic recovery program after the Great Depression and, in the case of *Schechter Poultry*, "the most sweeping congressional delegation of all time." KENNETH CULP DAVIS AND RICHARD J. PIERCE, JR., ADMINISTRATIVE LAW TREATISE § 2.6, 70–71 (3d ed. 1994). Likewise, Judge Leventhal characterized these cases as arising from an "extremist pattern" of "delegation run riot" in the New Deal era. *Amalgamated Meat Cutters and Butcher Workmen of North America, AFL–CIO v. Connally*, 337 F.Supp. 737, 763 (D.D.C.1971) (three-judge court). And as Professor Davis has pointed out, "[t]he *Panama* decision cannot be reconciled with earlier or later decisions of the Supreme Court," and neither *Panama* nor *Schechter* "reflect the law today." KENNETH CULP DAVIS AND RICHARD J. PIERCE, JR., ADMINISTRATIVE LAW TREATISE § 2.6, 71–72 (3d ed.1994).

As Judge Murphy said in her dissent from the panel decision in *South Dakota v. U.S. Dep't of Interior*, the only decision in six decades to find a congressional delegation of authority unconstitutional,

> Only twice in its history, and not since 1935, has the Supreme Court invalidated a statute on the ground of excessive delegation of legislative authority. Since 1935, the Supreme Court has consistently upheld statutes involving broad delegations of authority. *See e.g., Mistretta v. United States*, 488 U.S. 361, 372–73, 109 S.Ct. 647, 654–55, 102 L.Ed.2d 714 (1989) (authority to promulgate sentencing guidelines for federal criminal offenses); *Lichter v. Unit-*

---

**5.** Interestingly, in *Field v. Clark*, the Supreme Court upheld the delegation by Congress to the President to impose duties on the import of certain items if the country of origin imposed unreasonable duties on American-made goods. 143 U.S. at 694, 12 S.Ct. at 505. Similarly, in a case in which the Court made the unequivocal statement, "That the legislative power of Congress cannot be delegated is, of course, clear," the Court upheld the delegation of power by Congress to the Secretaries of the Treasury, Agriculture, Commerce and Labor to make rules and regulations permitting variations to and exemp-

tions from a "hard and fast rule" regarding the proper labeling of food. *United States v. Shreveport Grain & Elevator Co.*, 287 U.S. 77, 82, 85, 53 S.Ct. 42, 43–44, 44–45, 77 L.Ed. 175 (1932) ("Congress may declare its will, and, after fixing a primary standard, devolve upon administrative officers their 'power to fill up the details' by prescribing administrative rules and regulations."). *See United States v. Grimaud*, 220 U.S. 506, 521, 31 S.Ct. 480, 484, 55 L.Ed. 563 (1911) ("[T]he authority to make administrative rules is not a delegation of legislative power.").

ed States, 334 U.S. 742, 785–86, 68 S.Ct. 1294, 1316–17, 92 L.Ed. 1694 (1948) (authority to determine excessive profits); *American Power & Light Co. v. SEC,* 329 U.S. 90, 67 S.Ct. 133, 91 L.Ed. 103 (1946) (authority to prevent unfair or inequitable distribution of voting power among security holders); *Yakus v. United States,* 321 U.S. 414, 64 S.Ct. 660, 88 L.Ed. 834 (1944) (authority to fix commodity prices that would be fair and equitable and would effectuate purpose of Emergency Price Control Act of 1942); *FPC v. Hope Natural Gas Co.,* 320 U.S. 591, 600, 64 S.Ct. 281, 286–87, 88 L.Ed. 333 (1944) (authority to determine just and reasonable rates); *National Broadcasting Co. v. United States,* 319 U.S. 190, 225–26, 63 S.Ct. 997, 1013, 87 L.Ed. 1344 (1943) (authority to regulate broadcast licensing for "public interest, convenience, or necessity"). The delegation doctrine has in fact evolved into a tool of statutory construction, by which reviewing courts give "narrow constructions to statutory delegations that might otherwise be thought to be unconstitutional." *See Mistretta,* 488 U.S. at 373 n. 7, 109 S.Ct. at 655 n. 7.

69 F.3d at 886 (Murphy, J., dissenting).

In 1944, in upholding the delegation to the Office of Price Administration under the Emergency Price Control Act of the authority to set maximum prices and decide when they should be imposed, the Supreme Court recognized the value of congressional delegation in the modern administrative state:

> The Constitution as a continuously operative charter of government does not demand the impossible or the impracticable. It does not require that Congress find for itself every fact upon which it desires to base legislative action or that it make for itself detailed determinations which it has declared to be prerequisite to the application of the legislative policy to particular facts and circumstances impossible for Congress itself properly to investigate.

*Yakus v. United States,* 321 U.S. 414, 424, 64 S.Ct. 660, 667, 88 L.Ed. 834 (1944).

Since *Yakus,* the nondelegation doctrine has diminished in importance as the Supreme Court and other courts have continued to recognize the necessity of congressional delegation. *See, e.g., Mistretta v. United States,* 488 U.S. 361, 372, 109 S.Ct. 647, 654, 102 L.Ed.2d 714 (1989) ("[T]he nondelegation doctrine ... do[es] not prevent Congress from obtaining the assistance of its coordinate Branches."); *Amalgamated Meat Cutters and Butcher Workmen of North America, AFL–CIO v. Connally,* 337 F.Supp. at 752 ("The national Government has the power to do what is needful for the great national purposes that identify this country's adjustments to change and ultimately survival.") Indeed, "in our increasingly complex society, replete with ever changing and more technical problems, Congress simply cannot do its job absent an ability to delegate power under broad general directives." *Mistretta v. United States,* 488 U.S. at 372, 109 S.Ct. at 655. Therefore, today the nondelegation doctrine is reserved for what Judge Leventhal has called "the extremist instance." *Amalgamated Meat Cutters and Butcher Workmen of North America, AFL–CIO v. Connally,* 337 F.Supp. at 762.

Plaintiff asserts that Section 147 of the Farm Bill is one of those extreme cases of impermissible congressional delegation that Judge Leventhal had in mind and that the Supreme Court struck down in two cases at the height of the New Deal over sixty years ago. Plaintiff argues that Article I, Section 10, Clause 3 of the United States Constitution means that the power to approve any interstate compact rests exclusively with Congress, and that Congress in Section 147 of the Farm Bill unconstitutionally delegated to the Secretary of Agriculture its exclusive power to consent to the Northeast Interstate Dairy Compact by first requiring him to find a compelling public interest in order to grant the New England states the authority to implement the Compact. The Court disagrees.

The Court finds that Congress did expressly consent to the Compact, as it was required to do by the Constitution, and that it did not delegate its "exclusive" power to consent to an interstate compact to the Secretary of Agriculture. Under Article I, Section 10, Clause 3, Congress exercises "national supervision through its power to grant or

withhold consent, or to grant it under appropriate conditions." *Petty v. Tennessee–Missouri Bridge Commission*, 359 U.S. 275, 282 n. 7, 79 S.Ct. 785, 790 n. 7, 3 L.Ed.2d 804 (1959) (quoting Frankfurter and Landis, *The Compact Clause of the Constitution—A Study in Interstate Adjustments*, 34 YALE L.J. 685, 694–95 (1925)). In this case, Congress made its consent subject to the fulfillment of certain conditions, one being that the Secretary of Agriculture make a finding that approval of the Compact was a compelling public interest in the Northeast region.[6] In other words, the Compact had already been conditionally consented to by the Congress when the Secretary began the process of making his public interest finding. By conditioning its consent to the Compact on the making of such a finding, Congress did not run afoul of the nondelegation doctrine. As the Supreme Court has said, "[i]t can hardly be doubted that in giving consent [to a compact] Congress may impose conditions." *James v. Dravo Contracting Co.*, 302 U.S. 134, 148, 58 S.Ct. 208, 216, 82 L.Ed. 155 (1937); *see Tobin v. United States*, 306 F.2d 270, 272 (D.C.Cir.), *cert. denied*, 371 U.S. 902, 83 S.Ct. 206, 9 L.Ed.2d 165 (1962).

■ Plaintiff also argues that Section 147 of the Farm Bill is unconstitutional because even if it were a proper delegation of congressional authority, it fails to provide the Secretary of Agriculture with any "intelligible principles" according to which he must act. *See Loving v. United States*, —— U.S. ——, ——, 116 S.Ct. 1737, 1750, 135 L.Ed.2d 36 (1996). Plaintiff asserts that the "compelling public interest" standard is too vague to function as such an intelligible principle and could not have meaningfully guided the Secretary's finding or "enable[d] Congress, the courts and the public to ascertain whether the [Secretary] ... ha[d] conformed to those standards." *Yakus v. United States*, 321 U.S. at 426, 64 S.Ct. at 668.

■ The "intelligible principle" standard on which plaintiff relies is of course the proper touchstone for analysis. As the Supreme Court has stated: "So long as Congress 'shall lay down by legislative act an

intelligible principle to which the person or body authorized to [exercise the delegated authority] is directed to conform, such legislative action is not a forbidden delegation of legislative power.'" *Mistretta v. United States*, 488 U.S. at 372, 109 S.Ct. at 655 (quoting *J.W. Hampton, Jr. & Co. v. United States*, 276 U.S. 394, 409, 48 S.Ct. 348, 352, 72 L.Ed. 624 (1928)). As our court of appeals has noted, however, "Only the most extravagant delegations of authority, those providing *no standards* to constrain administrative discretion, have been condemned by the Supreme Court as unconstitutional." *Humphrey v. Baker*, 848 F.2d 211, 217 (D.C.Cir.), *cert. denied*, 488 U.S. 966, 109 S.Ct. 491, 102 L.Ed.2d 528 (1988) (emphasis added).

Where plaintiff's argument succeeds in theory, it fails in practice. Standards that are equally or perhaps even more "vague" than the "compelling public interest" standard have been upheld by the Supreme Court as providing more than adequate guidance in such diverse fields as transportation, communications and natural gas regulation, among many others. *See, e.g., Tagg Bros. & Moorhead v. United States*, 280 U.S. 420, 435, 442–43, 50 S.Ct. 220, 225–26, 74 L.Ed. 524 (1930) (upholding legislation delegating to the Secretary of Agriculture the authority to establish and enforce "just and reasonable" rates and charges for the furnishing of stockyard services); *New York Central Securities Corp. v. United States*, 287 U.S. 12, 24, 53 S.Ct. 45, 48, 77 L.Ed. 138 (1932) (permitting legislation delegating authority to consolidate carriers when "in the public interest"); *National Broadcasting Co. v. United States*, 319 U.S. 190, 225–26, 63 S.Ct. 997, 1013–14, 87 L.Ed. 1344 (1943) (permitting licensing of radio communications "as public convenience, interest or necessity requires"); *FPC v. Hope Natural Gas Co.*, 320 U.S. 591, 600–04, 64 S.Ct. 281, 286–89, 88 L.Ed. 333 (1944) (permitting "just and reasonable" rates for natural gas); *Yakus v. United States*, 321 U.S. at 427, 64 S.Ct. at 668–69 (sufficiently definite standard that maximum beef prices must be "generally fair and equitable"); *Lichter v. United States*, 334 U.S.

---

6. *See infra* note 4 for the several other conditions Congress placed on its consent to the Compact.

742, 785–87, 68 S.Ct. 1294, 1316–18, 92 L.Ed. 1694 (1948) (permitting recovery of "excessive profits" earned on war contracts); *see also Amalgamated Meat Cutters and Butcher Workmen of North America, AFL–CIO v. Connally,* 337 F.Supp. at 764 (permitting Presidential stabilization of prices, rents, wages, and salaries "with such adjustments as might be necessary to prevent gross inequities").

Thus, since 1935 the Supreme Court has upheld, "without deviation, Congress' ability to delegate power under broad standards." *Mistretta v. United States,* 488 U.S. at 373, 109 S.Ct. at 655; *see Loving v. United States,* —— U.S. at ——, 116 S.Ct. at 1750 (since 1935, Supreme Court has "upheld, without exception, delegations under standards phrased in sweeping terms"). Plaintiff's intelligible principles argument therefore must fail.[7]

■ During oral argument and in its post-argument supplemental brief, plaintiff asserted that its nondelegation doctrine argument was bolstered by the following statement in the Secretary's press release published with his finding of a compelling public interest: "If my expectations are not met, or if conditions otherwise warrant, I will revoke this authorization to implement the Compact." 61 FED.REG. 44,291 (1996); Pl.'s Mot. for Prelim. Injunction, Ex. 30. The Secretary's opinion that he can revoke his authorization to implement the Compact is troublesome but of no effect. His view of the scope of his authority cannot constitute an unconstitutional congressional delegation of legislative authority; only the Congress can do that. Since Congress never stated in Section 147 that the Secretary would have the power to revoke his approval to implement the Compact consented to by Congress, it is obvious to the Court that the Secretary has no such

authority. If the Secretary's view of what is a compelling public interest changes, or if the circumstances that gave rise to his finding are altered, he may, of course, report that fact to the Congress which may well have the authority to rescind or amend the Compact. *See* Compact Art. VIII, § 22 ("Congress reserves the right to amend or rescind this interstate compact at any time."). *But see Tobin v. United States,* 306 F.2d at 273–75.[8]

In sum, Congress did not delegate to the Secretary of Agriculture its constitutionally-mandated legislative authority to consent to interstate compacts. Rather, it placed conditions on its consent to the Northeast Dairy Compact, one of which required the Secretary of Agriculture to make a "compelling public interest" finding. Furthermore, the "compelling public interest" standard it articulated is well within the broad definition of an "intelligible principle" previously approved by the courts. The Court therefore concludes that plaintiff is not likely to succeed on the merits of its nondelegation doctrine claim.

### 2. *Administrative Procedure Act*

Under the Administrative Procedure Act, "a person suffering legal wrong because of agency action, or adversely affected or aggrieved by agency action within the meaning of a relevant statute is entitled to judicial review thereof." 5 U.S.C. § 702. "Agency action" under the APA is defined as "the whole or a part of an agency rule, order, license, sanction, relief, or the equivalent or denial thereof, or failure to act." 5 U.S.C. § 551(13). Agency action that is arbitrary and capricious, an abuse of discretion or a violation of law must be set aside. 5 U.S.C. § 706(2)(A). Plaintiff argues that the Secretary of Agriculture's finding of a compelling public interest was arbitrary and capricious because the Secretary articulated no coher-

---

**7.** Under this Court's decision in *Amalgamated Meat Cutters,* it is plaintiff who has the burden of proving "that there is an absence of standards for the guidance of the Administrator's action, so that it would be impossible in a proper proceeding to ascertain whether the will of Congress has been obeyed." 337 F.Supp. at 746 (quoting *Yakus v. United States,* 321 U.S. at 426, 64 S.Ct. at 668). Plaintiff has failed to meet its burden in this case.

**8.** Had Congress itself purported to give the Secretary the power to revoke the approval to implement, the question before the Court would be infinitely more difficult and might implicate the nondelegation doctrine. Had Congress purported to give the Secretary the power to revoke Congress' consent, there would very likely have been an unconstitutional delegation of legislative authority. But Congress did neither.

ent reasons to support his finding. Plaintiff maintains that it is entitled to a preliminary injunction because it is likely to succeed on this claim.

■ Initially defendant and defendant-intervenor, like plaintiff, premised their APA arguments on the notion that the Secretary's finding was an informal rulemaking. During oral argument and in its supplemental brief, however, defendant argued for the first time that the Secretary's finding was not "agency action" within the meaning of the APA because it was neither a rule, an adjudication, a finding, an order nor any of the other actions that make up the APA's definition of "agency action." It maintains that the Secretary's decision therefore is not subject to judicial review. In its supplemental brief, defendant-intervenor joined this argument, urging that because the Secretary's finding "does not fit within any cognizable category" under the APA's definition of agency action the Secretary's finding is "an assignment wholly outside the scope of the APA." Defendant-intervenor's Supplemental Brief at 6.

■ The Court rejects this argument. Almost any action taken by an agency is either a rule, an order, an adjudication or "the equivalent ... thereof," 5 U.S.C. § 551(13), which, if final, is subject to judicial review. 5 U.S.C. § 702. *See Paradyne Corp. v. United States Dep't of Justice,* 647 F.Supp. 1228, 1231–32 (D.D.C.1986). There is a strong presumption that agency action is reviewable by the courts, and this presumption cannot be overcome without clear and convincing evidence that Congress intended otherwise. *Bowen v. Michigan Academy of Family Physicians,* 476 U.S. 667, 670, 106 S.Ct. 2133, 2135–36, 90 L.Ed.2d 623 (1986); *Citizens to Preserve Overton Park, Inc. v. Volpe,* 401 U.S. 402, 410, 91 S.Ct. 814, 820–21, 28 L.Ed.2d 136 (1971); *Abbott Laboratories v. Gardner,* 387 U.S. 136, 140–41, 87 S.Ct. 1507, 1510–12, 18 L.Ed.2d 681 (1967). Very rarely does Congress withhold judicial review. The exceptions, those few matters wholly committed to unreviewable agency discretion, are extremely rare. *See Franklin v. Massachusetts,* 505 U.S. 788, 816–20, 112 S.Ct. 2767, 2783–86, 120 L.Ed.2d 636 (1992) (Stevens, J., concurring). Neither the argu-

ments of defendant and defendant-intervenor nor the few, entirely distinguishable cases they cite persuade the Court that this is one of those rare exceptions.

The Court concludes that the Secretary's compelling public interest finding was a rule that resulted from an informal rulemaking. The APA broadly defines a rule as "the whole or part of an agency statement of general or particular applicability and future effect designed to implement, interpret, or prescribe law or policy or describing the organization, procedure or practice requirements of an agency...." 5 U.S.C. § 551(4). As our court of appeals has noted, the APA's definition of a rule includes. "nearly every statement an agency may make." *Center for Auto Safety v. NHTSA,* 710 F.2d 842, 846 (D.C.Cir.1983); *see Batterton v. Marshall,* 648 F.2d 694, 700 (D.C.Cir.1980) ("The breadth of this definition cannot be gainsaid."); *National Wildlife Fed'n v. Babbitt,* 835 F.Supp. 654, 661 (D.D.C.1993) (same).

The Secretary's action meets all the requirements of the definition of a "rule" under the APA. *See National Wildlife Fed'n v. Babbitt,* 835 F.Supp. at 661. First, the Secretary's finding is a "statement of general or particular applicability." 5 U.S.C. § 551(4). In contrast to an adjudication, the decision was issued as part of an agency statement and does not purport to decide whether the Compact would benefit a particular individual or to resolve past and present rights and liabilities of particular individuals. *See Association of Nat'l Advertisers, Inc. v. FTC,* 627 F.2d 1151, 1160 (D.C.Cir.1979). Rather, it is a determination whether the general public or the Compact region is benefitted by the Compact. *See Motion Picture Ass'n of America v. Oman,* 969 F.2d 1154, 1157 (D.C.Cir.1992) (rule is decision of general application rather than decision affecting a particular individual); *Association of Nat'l Advertisers, Inc. v. FTC,* 627 F.2d at 1160 (contrasting rulemaking and adjudication). Second, the decision has a prospective or "future effect" by allowing the Compact Commission to begin its operations. *See Yesler Terrace Community Council v. Cisneros,* 37 F.3d 442, 448 (9th Cir.1994) ("Rulemaking ... is prospective, and has a defini-

tive effect on individuals only after the rule subsequently is applied."); *Community Nutrition Inst. v. Young,* 818 F.2d 943, 946 (D.C.Cir.1987) (agency decision is a "rule" under APA where it has future effect). Third, the statement is "designed to implement" a law. 5 U.S.C. § 551(4). The Secretary's finding of a compelling public interest served to implement Congress' consent of the Northeast Compact. *See RLC Indus. Co. v. Commissioner of IRS,* 58 F.3d 413, 417 (9th Cir.1995) ("rule" completes a congressional act). In sum, the Secretary's decision bears all the earmarks of a rule.

The administrative steps Secretary Glickman took before making his finding are telling in themselves. The Secretary followed most of the steps required for a rulemaking under the APA: He published a Federal Register notice soliciting public comment, he received comments, and he then published his finding in the Federal Register. *See* 5 U.S.C. § 553(b), (c), (d). Even though the Secretary did not entitle the agency action a "rule," the D.C. Circuit has held that if the administrator follows the administrative steps necessary for a rulemaking, the final agency action is invariably a "rule." *City of Chicago v. FPC,* 458 F.2d 731, 739 (D.C.Cir. 1971); *see also Motion Picture Ass'n of America v. Oman,* 969 F.2d at 1157. "[I]t is the substance of what the [agency] has purported to do and has done which is decisive." *Center for Auto Safety v. NHTSA,* 710 F.2d at 846 (quoting *Columbia Broadcasting System, Inc. v. United States,* 316 U.S. 407, 416, 62 S.Ct. 1194, 1199–1200, 86 L.Ed. 1563 (1942)).

■■■■■ In reviewing an informal rulemaking to determine if it is "arbitrary and capricious," the Court must first make a "searching and careful inquiry." *International Ladies' Garment Union v. Donovan,* 722 F.2d 795, 815 (D.C.Cir.1983); *see Citizens to Preserve Overton Park, Inc. v. Volpe,* 401 U.S. at 416, 91 S.Ct. at 823. The Court's inquiry necessarily involves a review of the agency's reasons for its rulemaking decision; thus, if the agency or Department has failed to "cogently explain why it has exercised its discretion in a given manner," *International Ladies' Garment Union v. Donovan,* 722

F.2d at 815 n. 35, a searching and careful inquiry is impossible, and the action of the Department or agency must be set aside as arbitrary and capricious. *See Bowen v. American Hospital Ass'n,* 476 U.S. 610, 626–27, 106 S.Ct. 2101, 2112–13, 90 L.Ed.2d 584 (1986); *Motor Vehicle Mfrs. Ass'n v. State Farm Mutual Auto. Ins. Co.,* 463 U.S. 29, 43, 103 S.Ct. 2856, 2866–67, 77 L.Ed.2d 443 (1983). Although the court may "uphold a decision of less than ideal clarity if the agency's path may reasonably be discerned," *Bowman Transp., Inc. v. Arkansas–Best Freight System,* 419 U.S. 281, 286, 95 S.Ct. 438, 442, 42 L.Ed.2d 447 (1974), at a minimum, an agency must articulate why it has exercised its discretion in a particular way and provide an adequate explanation for its action. Mere conclusory statements are not enough. *Motor Vehicle Mfrs. Ass'n. v. State Farm Mutual Auto Ins. Co.,* 463 U.S. at 48–49, 103 S.Ct. at 2869–70; *International Fabricare Inst. v. EPA,* 972 F.2d 384, 389, 392 (D.C.Cir.1992).

■■■■■ Although there is a "presumption in favor of the validity of administrative action," *Ethicon, Inc. v. FDA,* 762 F.Supp. 382, 386 (D.D.C.1991); *see Motor Vehicle Mfrs. Ass'n v. State Farm Mutual Auto Ins. Co.,* 463 U.S. at 43, 103 S.Ct. at 2866–67; *Ethyl Corp. v. EPA,* 541 F.2d 1, 34 (D.C.Cir.), *cert. denied,* 426 U.S. 941, 96 S.Ct. 2662, 2663, 49 L.Ed.2d 394 (1976), the Court concludes that the Secretary's finding in this case is wholly lacking because he failed to articulate any coherent explanation for his finding in his one-paragraph, two-sentence decision. *See Consumer Fed'n of America v. U.S. Dep't of Health and Human Services,* 83 F.3d 1497, 1506 (D.C.Cir.1996) (agency's "explanation is simply too terse to support the agency's decision"). In the absence of such an explanation, the Court cannot exercise a "searching and careful inquiry" of the Secretary's reasons for finding a compelling public interest in the approval of the Compact.

As plaintiff points out, the Secretary's finding consists essentially of four statements: (1) that the relevant state legislatures approved the Compact, (2) that the governor of each state signed a resolution supporting it, (3) that Congress had consented to it, and (4)

that ninety-five percent of the comments received supported its implementation. Only the fourth fact was unknown before the Secretary asked for comments, and the mere quantity of favorable comments by itself hardly supports a finding of a compelling public interest in the · Compact region. A simple head count will not do. *Natural Resources Defense Council v. EPA,* 822 F.2d 104, 122 n. 17 (D.C.Cir.1987) (agency decision-making is not "a democratic process by which the majority of commentators prevail by sheer weight of numbers"). The quality, content, reasoning and tenor of the comments might possibly support the finding, but the Secretary failed to explain how.

Indeed, the Secretary is substantially more voluble and explicit about the concerns he has about the Compact than he is about his reasons for making a compelling public interest finding. In the Secretary's press statement published with the finding, he expressed concern about burdening other regions of the country, the potential for the Commission to restrict the ability of producers to ship milk into the Compact region, whether the Compact might have adverse effects on the income of dairy producers outside the Compact region, the extent to which the Commission might utilize its authority to impose production controls, the effect of the Compact on the Department's nutrition programs, and the effect of the Compact on consumers, especially low-income families, within the Compact region. 61 FED.REG. 44,291 (1996); Pl.'s Mot. for Prelim. Injunction, Ex. 30. These concerns, expressed in four paragraphs, overshadow the four reasons, expressed in two sentences, that the Secretary gave for finding a compelling public interest.

Defendant, defendant-intervenor and the six New England states in their *amicus curiae* brief all argue that the record fully supports the Secretary's compelling public interest finding. Each of them pulls bits and pieces from the exhibits submitted by plaintiff (including the "legislative history" from bills never enacted) and from the comments submitted to the Secretary, as well as from the material considered by some of the state legislatures and governors. From these materials, they argue that the record contains overwhelming support for the Secretary's finding. That may or may not be true. But no˙ matter how thorough counsel may have been in combing through the record and picking out the materials they think support the Secretary's finding, that is no substitute for the Secretary himself reviewing the record materials, examining the relevant data, and coherently articulating the decision he made and the bases on which ·he in fact rested his finding—which is, of course, his obligation under the APA. *Motor Vehicle Mfrs. Ass'n v. State Farm Mutual Auto Ins. Co.,* 463 U.S. at 48–49, 103 S.Ct. at 2869–70. "An agency's action must be upheld, if at all, on the bases articulated by the agency itself," not those articulated after the fact by its lawyers. *Id.* at 50, 103 S.Ct. at 2870; *see Citizens to Preserve Overton Park, Inc. v. Volpe,* 401 U.S. at 419–20, 91 S.Ct. at 825–26 (litigation affidavits are merely "post-hoc" rationalizations that cannot be the basis for review under section 706 of the APA); *City of Brookings Municipal Telephone Co. v. FCC,* 822 F.2d 1153, 1165 (D.C.Cir.1987) ("Post hoc rationalizations advanced to remedy inadequacies in the agency's record or its explanation are bootless."). A court may not "supply a reasoned basis for the agency's action that the agency itself has not given." *Motor Vehicle Mfrs. Ass'n v. State Farm Mutual Auto Ins. Co.,* 463 U.S. at 43, 103 S.Ct. at 2867 (quoting *SEC v. Chenery Corp.,* 332 U.S. 194, 196, 67 S.Ct. 1575, 1577, 91 L.Ed. 1995 (1947)).

Because the Secretary failed to articulate any coherent reasons or justification for his finding of a compelling public interest, the Court concludes that there is a substantial likelihood that plaintiff will succeed on the merits of its APA claim.

### C. Irreparable Harm and the Public Interest

Plaintiff argues that its members will suffer irreparable harm because the Compact Commission will increase the prices plaintiff's members will have to pay for milk by setting and charging minimum prices above the federal minimum, collecting the money charged from milk processors and distributing it among the more than 4,000

New England dairy farmers, so that it will be impossible for plaintiff's members to recover the excess even if ultimately they are successful in this litigation.[9] Defendant and defendant-intervenor do not dispute the fact that if the Compact Commission raises the price that milk producers must pay dairy farmers the money will be unrecoverable. They maintain, however, that plaintiff's irreparable harm argument is based on conjecture and speculation because the Commission has not yet raised prices, there is no assurance that it will do so, and there are numerous procedural steps that must be taken before the Commission decides whether to set higher prices. Finally, they argue that it would be an extraordinary and unwarranted step to enjoin a compact consented to by Congress, which the Secretary of Agriculture has found to be in the "compelling public interest" because it offers "the best opportunity to strengthen the dairy industry in the Compact region."[10]

As defendant and defendant-intervenor point out, before the Commission can issue a price order, several procedural steps must be followed: (1) the Commission must undertake notice-and-comment rulemaking, hold a public hearing, consider specific criteria, and issue a written opinion; (2) each of the six member states is given one vote, and the establishment or termination of a price order over the federal price requires a two-thirds vote of the states; (3) each state is given the absolute right to opt-out of any specific regulation with which it does not agree; (4) the Commission must conduct a formal referendum of producers within the regulated area, in which the terms of the pricing order must be approved by a two-thirds vote before any order goes into effect; and (5) any Commis-

sion order is subject to judicial review. Compact Art. I, § 3, Art III, § 5, Art. IV, § 9(e), Art V, §§ 11–13, Art. VI, § 16(c). Defendant and defendant-intervenor maintain that in these circumstances, and with these procedural protections in place, plaintiff has failed to show that "the injury complained of [is] of such imminence that there is a 'clear and present' need for equitable relief to prevent irreparable harm." *Ashland Oil, Inc. v. FTC,* 409 F.Supp. 297, 307 (D.D.C.), *aff'd,* 548 F.2d 977 (D.C.Cir.1976) (citation and internal quotations omitted); *see also Wisconsin Gas v. FERC,* 758 F.2d 669, 674 (D.C.Cir.1985).

Defendant and defendant-intervenor argue that if the Court issues an injunction, defendant-intervenor will be injured because it will be delayed from implementing the Compact pending resolution of this case on the merits. And defendant-intervenor asserts that an injunction could seriously injure the Compact region, whose dairy farmers are already suffering severe economic problems, and that a preliminary injunction would stop the Commission in its tracks before it has had a chance to address the problems, whether through raising prices or through its investigative or other functions. Its position is supported by the *amicus* brief of the six Northeast Dairy Compact states. Of course, these arguments represent the flip side of plaintiff's injury argument: implementation of the Compact would cause economic harm to plaintiff, while failure to implement would cause economic injury to defendant-intervenor's members and the New England states.

As for the public interest, plaintiff argues that a preliminary injunction would be in the interest of the consuming public, while defen-

---

**9.** It also argues that because Congress and the Secretary of Agriculture have acted in a way that contravenes separation of powers, plaintiff's injuries are constitutional in nature and that constitutional injuries are irreparable *per se.* Because the Court has rejected plaintiff's non-delegation argument and because its "unconstitutional *per se*" argument, when accepted at all, has only been applied in the First Amendment context, the Court rejects this argument. *See Hohe v. Casey,* 868 F.2d 69, 73 (3d Cir.), *cert. denied,* 493 U.S. 848, 110 S.Ct. 144, 107 L.Ed.2d 102 (1989); *Student Press Law Center v. Alexander,* 778 F.Supp. 1227 (D.D.C.1991).

**10.** On October 18, 1996, defendant-intervenor, Northeast Dairy Compact Commission, filed a supplemental brief regarding an administrative assessment adopted by the Commission on October 17, 1996. This one-year administrative assessment would be levied on all milk processors in the New England region. The Court is not persuaded that plaintiff's irreparable injury argument is strengthened by the Commission's adoption of this administrative assessment.

dant makes an equally strong argument that a preliminary injunction would not be in the public interest because of the harm it would cause to Northeast dairy farmers and to the Compact duly consented to by Congress. The Court would be better equipped to balance the public interest factors if Congress had explained the public interest considerations that led it to pass Section 147 of the Farm Bill in the first place, or if the Secretary of Agriculture had articulated his reasons for finding a compelling public interest in the Compact region. While Congress is not required to articulate the reasons for its actions, the Secretary of Agriculture is. A carefully crafted and articulated statement of reasons for his compelling public interest finding by the Secretary of Agriculture would have been of great assistance to the Court in considering the balance of harms, but no such statement exists. Under the circumstances, the Court cannot make an educated decision regarding whether issuing a preliminary injunction in this case would or would not be in the public interest.

Our court of appeals has recently reiterated the principle that even though the courts have a great degree of flexibility in applying the four-part test of *Holiday Tours,* the moving party must always demonstrate at least "some injury" because "[t]he basis for injunctive relief in the federal courts has always been irreparable harm." *CityFed Fin. Corp. v. Office of Thrift Supervision,* 58 F.3d at 747 (citation and internal quotations omitted). In this case, plaintiff has failed to show certain, imminent irreparable harm. As defendant and defendant-intervenor point out, the Compact was explicitly designed with significant limitations on the Commission's ability to act swiftly. Unless the Court is to assume that the procedural steps—including notice, public comment, referenda and super-majority voting requirements—are mere charades, there is as yet no assurance that the Commission will in fact raise milk prices, or when, and thus there is no irreparable harm at this time. While it appears that a clear mission of the Commission is eventually to raise the Northeast region's milk prices above the federally regulated price order, a claim of injury for a possible future pricing order at this point is speculative and conjectural. *See*

Compact Art. II, § 2(8), Art. IV, §§ 9, 10; 61 FED.REG. 44,291; Pl.'s Mot. for Prelim. Injunction, Ex. 30. Until the Compact Commission adopts a pricing order or at least is much further along in its process, plaintiff has not been irreparably harmed.

## III. CONCLUSION

Although plaintiff is unlikely to succeed on the merits of its nondelegation argument, it has a substantial—indeed, almost certain—likelihood of success on the merits of its APA claim. On the other hand, the irreparable injury it may suffer is remote and speculative. In the absence of *some* showing of immediate and irreparable injury, the Court must deny the request for a preliminary injunction, although it does so without prejudice to plaintiff's filing an application for a temporary restraining order or motion for preliminary injunction if circumstances later warrant.

Since plaintiff ultimately is likely to succeed on the merits of this case, requiring the Secretary of Agriculture's rule to be set aside under the APA, and since the parties are in agreement that this case should be put on a fast track and will be disposed of on dispositive motions without a trial, the Court will set an expedited briefing and argument schedule.

An Order consistent with this Opinion is issued this same day.

SO ORDERED.

## ORDER

Upon consideration of the memorandum in support of plaintiff's motion, defendant's and defendant-intervenor's opposition briefs, plaintiff's reply brief, each party's supplemental brief, the memoranda discussing the issue of an administrative assessment, the *amicus curiae* briefs of the six Northeast Dairy Compact states and of the Midwestern states of Minnesota, Wisconsin, North Dakota, South Dakota, and Senators Paul Wellstone, Rod Grams, Russell D. Feingold and Herbert Kohl, and the arguments presented by counsel in open Court, and for the reasons stated in the Court's accompanying Opinion, it is hereby

ORDERED that Plaintiff's Motion for Preliminary Injunction is DENIED; and it is

FURTHER ORDERED that any necessary discovery shall be completed by December 31, 1996. Motions for summary judgment and motions to dismiss shall be filed by January 23, 1997; oppositions by February 7, 1997; and reply briefs by February 14, 1997. The Court will hear oral argument on February 25, 1997 at 2:00 p.m.

SO ORDERED.